## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

IN RE:                   )

                          )    **CASE NUMBER 06-60429-mhm**

**HOME EQUITY LOAN PRODUCTS, INC.** )

                          )    **CHAPTER 7**

                          )

                          )    **JUDGE MURPHY**

### BRIEF IN OPPOSITION

COMES NOW Home Equity Loan Products, Inc. ("Corporation"), by and through

undersigned counsel, and submits this Brief in Opposition ("Brief") in response to the Motion by

William F. Perkins to Dismiss Bankruptcy Case and/or for Abstention ("Motion"). As shown in

more detail *infra*, Movant William F. Perkins ("Mr. Perkins") does not have standing to seek

relief, and the relief Mr. Perkins seeks should not be granted on the merits.

1.    **Factual and Procedural Background**

    Mr. Perkins's factual and procedural background contains a number of errors and

omissions that are not pertinent to the Motion or this Brief, and therefore are not addressed

herein. But certain of those errors and omissions are pertinent, and are addressed *infra*.

    A Chapter 7 petition in bankruptcy ("Petition") was filed on behalf of the Corporation on

January 13, 2006.[1] While the automatic stay was in effect, an order was entered on January 19,

2006 ("January 19 Order") in the Superior Court of Cobb County ("State Court"), at the request

of Joseph Armenia, Keith Armenia, and Gary Milkwick ("Plaintiffs").

---

[1] This filing is admittedly defective in several ways, but those defects are not fatal and may be cured.

As the attached copy shows, the January 19 Order purported to appoint Mr. Perkins as receiver as to assets of the Corporation and of Dream Avenue Mortgage Corp. ("Dream Ave"). Dream Ave is not involved in this case, but may soon have its own bankruptcy filing.

Mr. Perkins later filed the Motion, seeking to evade the automatic stay and this Court's exclusive jurisdiction over the Corporation's assets. The Corporation shows that Mr. Perkins has no standing to bring the Motion, and that the Motion should be denied on the merits even if Mr. Perkins had standing.

2.     **Argument and Citations of Authority**

    a.     *Mr. Perkins Has No Standing*

        i.     *Appointment Is a Nullity*

The automatic stay under 11 U.S.C. § 362(a)(3) prevents anyone other than the Court, the Trustee, or the Corporation (as debtor-in-possession) acting through the Corporation's Board of Directors (the "Board") from asserting control over any asset of the Corporation. When the January 19 Order was issued, the Corporation's assets were already in the bankruptcy estate, and were thus beyond the State Court's jurisdiction. Therefore, the appointment of Mr. Perkins as a receiver of the Corporation's assets was a nullity.[2]

---

[2]Mr. Perkins asserts that the State Court actually appointed him "from the bench" in a hearing before the Petition was filed, and that this alleged timing somehow renders the automatic stay ineffective as to him. The attached excerpt of the transcript of that hearing makes it clear, however, that any appointment of a receiver would be by written order, issued after the Plaintiffs' attorney submitted a proposed order acceptable to the State Court. The Plaintiffs' attorney had requested that the State Court recite an order from the bench given the State Court's unwillingness to sign the proposed order, but the State Court declined to do so.

    At any rate, even if Mr. Perkins were appointed receiver before the Petition was filed, as shown *infra* that appointment did not allow Mr. Perkins to ignore the automatic stay or deprive the Board of the exclusive power to make the decision to file the Petition.

ii.    *No Standing Even If Mr. Perkins Is a Receiver*

(1)    *Receiver's Narrow Role*

Even assuming that the State Court somehow retained jurisdiction to appoint a receiver

over property already in the bankruptcy estate, Mr. Perkins misapprehends his claimed role by

characterizing himself as the "duly appointed receiver of the above-referenced Debtor."

Mr. Perkins might try to argue that he is a "duly appointed receiver," which depends upon

Mr. Perkins evading the automatic stay, and what the Supreme Court of Georgia would rule on

appeal if the State Court fails to withdraw the erroneous appointment.[3]  But it is beyond honest

dispute that Mr. Perkins is not a receiver *of the Corporation* as he asserts, even if everything else

he says were correct.

(a)    *Receiver of Assets, Not Entity*

Plaintiffs sought the appointment of a receiver under O.C.G.A. §§ 9-8-1 through 9-8-3.

Those statutes permit receivership over *assets, not corporate entities.*  Accordingly, if Mr.

Perkins is a receiver at all, he is a receiver as to *assets* and not of the Corporation *as an entity.*

Georgia law contemplates the civil appointment of a receiver over corporate entities only

in an action to have a corporation judicially dissolved under O.C.G.A. § 14-2-1430. *See*

O.C.G.A. § 14-2-1432.  This is not a case of judicial dissolution of a corporation (*i.e.*, state-court

corporate bankruptcy), and Mr. Perkins cannot be a receiver of the Corporation *as an entity.*[4]

---

[3]Beyond the issue of the automatic stay and other defects, Mr. Perkins appears not to be a resident of the county in which the State Court action was pursued (Cobb County), a requirement for a receiver under O.C.G.A. §§ 9-8-8 and 9-8-9.

[4]This fact distinguishes the authority Mr. Perkins incorrectly cites as "squarely on point" – *In re Fax Station, Inc.*,m 118 B.R. 176 (Bankr. D. R.I. 1990).

**In Re Home Equity Loan Products, Inc**    -3-    **Brief in Opposition to Motion to Dismiss**

(b)    *Receiver Role Controlled by Georgia Case Law*

Even assuming that Mr. Perkins were properly appointed notwithstanding the automatic

stay, and even if the receivership were an *entity* (as opposed to *asset*) receivership, there is no

question as to the narrow scope of Mr. Perkins's role under Georgia law because the Supreme

Court of Georgia has already specifically decided that very issue.

In *Pimper v. State*, 274 Ga. 674 (2001), a state court exercised criminal-RICO powers to

appoint a receiver to take sole control of two corporations, and a bankruptcy petition was

subsequently filed with respect to the corporations.  The Supreme Court of Georgia held that "the

receiver was automatically converted by operation of law into a Bankruptcy Court custodian, and

thus became authorized to dispose of property in the two bankruptcy estates only in accordance

with the directives of the Bankruptcy Court." *Id* at 625.  In light of the Bankruptcy Court's

exclusive jurisdiction, the Supreme Court of Georgia held that it did not even have jurisdiction to

hear appeals involving the bankrupt corporations' assets. *It*. at 626.

Accordingly, even if Mr. Perkins's appointment were valid despite the automatic stay,

and even if this were an *entity* receivership, then Mr. Perkins is simply custodian of assets in the

service of the Court and the Trustee.  As custodian Mr. Perkins arguably could protect those

assets, but he would have no standing to file the Motion (or even do anything with the assets

without the Trustee's consent).

(c)    *Mr. Perkins Concedes No Standing*

Mr. Perkins concedes that he does not have standing.  On Page 3 of the Motion, Mr.

Perkins correctly notes that any decision of the Corporation regarding bankruptcy is the sole

province of the Board.

Mr. Perkins points to no source for his apparent claim of authority to speak for the Board, other than the bald claim that he is receiver. Even so, Mr. Perkins argues that David Huffman ("Mr. Huffman") has no authority to speak for the Board. In fact, however -- as Mr. Perkins is and has been well aware – Mr. Huffman is Chairman of the Board. Mr. Huffman thus clearly has the power to speak for the Board to the extent the Board is in agreement with respect to the filing of the Petition.

For example, Mr. Perkins apparently did not even attempt to consult with any member of the Board before filing the Motion seeking to assert the Corporation's rights on matters Mr. Perkins correctly notes are reserved to the Board. In contrast, the Board has specifically empowered Mr. Huffman to seek bankruptcy protection for the Corporation.

Based upon Mr. Perkins's concession that decisions as to the Corporation's bankruptcy belong to the Board, it is beyond reasonable dispute that Mr. Perkins lacks standing to argue to this Court that the Corporation should not continue in bankruptcy.

(d)    *Nothing Substitutes Receiver for Board*

Nothing in the January 19 Order entitles Mr. Perkins to exercise the Board's powers, which include the right and responsibility to make decisions about the filing and continuation of the Petition.

The January 19 Order simply appoints Mr. Perkins to preserve assets alleged to be subject to receivership, and does not purport in any way to grant Mr. Perkins any power to make decisions reserved to the Board. The Plaintiffs did not ask for a receiver to have any such power, and nothing in the January 19 Order even arguably grants Mr. Perkins that power – nor, in fact, could that power be lawfully granted.

b.    *Dismissal Not Warranted on the Merits*

i.    *Defects Curable*

The admitted defects associated with the filing of the Petition can (and will, assuming the Motion is denied as it should be) be cured without any prejudice to the Court, the Trustee, any creditor or any other interested party.

ii.    *Dismissal Would Reward Unlawful Behavior*

(1)    *Plaintiffs' and Mr. Perkins's Willful Violations of Automatic Stay*

The purpose of the automatic stay includes "forestalling a race to the courthouse." *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F2d 711, 716 (5th Cir. 1985). Even *after* the Petition was filed, however, Mr. Perkins and the Plaintiffs unabashedly engaged in "trial by ambush" with "emergency" hearing after "emergency" hearing within a very short time.[5] That "trial by ambush" by the Plaintiffs, with Mr. Perkins as their willing accomplice, is precisely the kind of "race to the courthouse" the automatic stay is intended to prevent.

The Court should not reward Plaintiffs and Mr. Perkins for their willful breaches of the automatic stay, by dismissing the Petition (which would simply be replaced by a new petition that the Corporation would have every right to file). Instead, the Motion should be denied, and Mr. Perkins and the Plaintiffs should be called before the Court to explain, if they can, why they think 11 U.S.C. § 362 does not apply to them.

---

[5]Incredibly, two supposed "emergency" hearings were held *after* the filing of the Petition, even despite the Trustee's appearance at the first "emergency" hearing to notify the State Court that she was the Trustee, and that the derivative action was stayed by the filing of the Petition. Unfortunately, the State Court flatly ignored the automatic stay even while acknowledging "flying in the face" of the Bankruptcy Court's exclusive jurisdiction by proceeding. Even more incredibly, the supposed "emergency" is simply the attempt by Plaintiffs and Mr. Perkins to force the Corporation to abandon the Petition.

(2)    *Plaintiffs' Other Wrongful Behavior*

Whatever the scope, the supposed receivership is an obvious effort by the Plaintiffs to circumvent Georgia law, which wrongful behavior this Court should not reward.  The wrongful behavior is two-fold, because it is beyond honest dispute that there is no basis for a receivership under the facts alleged, and because the attempted receivership is an effort to achieve prejudgment attachment that Georgia law prohibits.[6]

(a)    *No Factual Basis for Receivership*

The assets as to which a receivership may be sought under the Code Sections upon which Plaintiffs relied are identified as (1) assets at issue in *in rem* actions (*see* O.C.G.A. § 9-8-1 – "any fund or property in litigation"); (2) joint or trust assets (*see* O.C.G.A. § 9-8-2 – "trust or joint property and funds"); and (3) collateral (*see* O.C.G.A. § 9-8-3 – "any assets charged with the payment of debts").  The assets as to which the Plaintiffs sought receivership do not even arguably fall within any of those categories; there is no *in rem* action, there is no trust or joint property, and the Plaintiffs do not have or assert any security interest in the assets.

Not only is there no factual basis for receivership, the extraordinary equitable relief of receivership is not available to the Plaintiffs under the facts alleged.  *See* O.C.G.A. § 9-5-6, which provides that "Creditors without liens may not, as a general rule, enjoin their debtors from disposing of property nor obtain injunctions or other extraordinary relief in equity."

---

[6]The Corporation is not asking this Court to treat the January 19 Order as invalid because it is not supported by law – although that is unquestionably the case.  Arguably the January 19 Order is entitled to full faith and credit until the State Court sets it aside (but only as far as that order goes, and subject to the impact of the automatic stay).  The Corporation is simply asking the Court to note the Plaintiffs' patent wrongful behavior, and not to reward that wrongful behavior by dismissing the Petition.

(b)    *De Facto Prejudgment Attachment*

The alleged receivership constitutes a *de facto* prejudgment attachment, sought despite the fact that Plaintiffs are not even arguably entitled to prejudgment attachment. Under O.C.G.A. § 18-3-1, prejudgment attachment is proper only "when the debtor: (1) Resides out of the state; (2) Moves or is about to move his domicile outside the limits of the county; (3) Absconds; (4) Conceals himself; (5) Resists legal arrest; or (6) Is causing his property to be removed beyond the limits of the state."

Plaintiffs do not have or even allege any grounds for pre-judgment attachment. Instead, they claim to have achieved *de facto* pre-judgment attachment (to which relief they are not entitled), by the appointment of a receiver (to which relief they also are not entitled).

Because the alleged receivership constitutes a *de facto* prejudgment attachment to which the Plaintiffs are not even arguably entitled, the receivership is patent wrongful behavior – which this Court should not reward.

c.    *Abstention Not Warranted on the Merits*

i.    *Abstention Not Warranted Factually*

In the case Mr. Perkins cited as "squarely on point" when it clearly is not[7] – *In re Fax Station, Inc.*, 118 B.R. 176 (Bankr. D. R.I. 1990) – seven factors were set forth to determine whether a bankruptcy court should abstain under 11 U.S.C. § 305: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are

---

[7]*In Re Fax Station, Inc.* is clearly distinguished by the fact that the underlying state court action in that case was an action for judicial dissolution under state law – essentially, state-law corporate bankruptcy. That is not the case here, as there is no action in the State Court seeking judicial dissolution.

**In Re Home Equity Loan Products, Inc**    -8-    **Brief in Opposition to Motion to Dismiss**

necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of the assets; (5) whether the debtor and creditors are able to work out less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought. As the following discussion of each factor shows, this case clearly belongs here, in the Bankruptcy Court:

### (1)    *Economy and Efficiency*

As the attached transcript of the first hearing shows, the State Court has already implored the parties to have this complex matter resolved in some other way. The State Court does not have the necessary processes, resources, or expertise to deal with the myriad of complex issues the Plaintiffs have created in bad faith by having a receiver appointed in order to achieve a grossly illegal *de facto* prejudgment attachment. The State Court's order appointing Mr. Perkins is so devoid of direction, that Mr. Perkins is now begging the State Court for some kind of instruction on what to do.

All of this is a direct result of the fact that state courts are not designed to handle what this Court handles every day. This Court has the procedures, resources, and expertise necessary for exactly this kind of situation involving claims to assets. Proceedings in this Court enjoy the orderly protection, for all concerned (or, at least, protection for those who are dealing in good faith), of the *automatic* stay to protect assets from the very kind of (false) assertions of asset diversion Plaintiffs made to seek relief the State Court had no power to grant.

In fact it is clear that if the Plaintiffs honestly wanted to protect the assets of the Corporation (as opposed to putting Dream Ave out of business as the receivership has done), Plaintiffs could and would have simply filed an involuntary petition against the Corporation.

Similarly, instead of a receiver asking a state court "what do I do now?" as Mr. Perkins has been left to do in light of an order Plaintiffs presented that was totally devoid of instructions, proceedings in this Court enjoy the availability of a cadre of trustees who know exactly what to do. This is because trustees in this Court have the necessary experience and because they have an orderly process and a precise set of rules.

Clearly, the economy and efficiency of administration favors keeping this matter in this Court.

(2)    *Whether Another Forum is Available*

Yes, an action *could* be brought in state court to dissolve the Corporation and thus resolve most of the issues this Court can handle. And, yes, there is a proceeding in State Court – sort of. That proceeding has, so far, resulted in a wild flurry of unlawful behavior by the Plaintiffs, and a severe lack of understanding by Mr. Perkins of what his role is and should be. As shown immediately *supra* with respect to "Economy and Efficiency," however, the State Court is woefully inadequate to handle this matter.

At any rate, abstention would be futile, because the State Court action simply cannot proceed. Even though the Corporation is a necessary party in the derivative action in State Court, *see*, *e.g.*, *Short v. McKinney*, 111 Ga. App. 557 (1965), Plaintiffs chose not to join the Corporation. This failure to join a necessary party, of course, renders the State Court action subject to dismissal – a defect that cannot be cured without relief from stay.

Under the facts, however, the Plaintiffs cannot obtain relief from stay under 11 U.S.C. § 362(d). Plaintiffs have thus impaled themselves upon the horns of a dilemma of their own making.

In this regard, a significant error is found in Mr. Perkins's assertion in the Motion that "one of the main issues in the underlying State Court Litigation is ownership and control of the Debtor." Apparently Mr. Perkins has not understood all 200+ numbered paragraphs of the Complaint, because exactly the opposite is true. In the Complaint – a copy of which is attached for the Court's information – the Plaintiffs concede that Mr. Huffman legally controls the Corporation. Indeed, the Plaintiffs' main incentive in filing the Complaint is that Mr. Huffman controls the Corporation as majority shareholder, and the Plaintiffs simply don't like that.

The imagined dispute over ownership and control, which Mr. Perkins suggests should be decided in State Court, simply does not exist. The only claims asserted are the Corporation's purported claims against present and former members of the Board, and Dream Ave.

Even though another forum is technically available, Plaintiffs already chose not to use that forum and that forum is not practicable.

(3)     *Whether Federal Proceedings are Necessary*

For the reasons shown above as to the inadequacy of the State Court, in terms of process, resources, and expertise, federal bankruptcy proceedings are necessary to reach a just and equitable solution. Furthermore, the Corporation submits that the winding up of the Corporation's affairs, in comparison to most debtors, is substantially more in need of federal bankruptcy protection because of the very nature of the Corporation's business as a mortgage company.

The Corporation is in possession of, and has a potential federal duty to protect, personal and confidential information of borrowers. The Board made the decision to cause the Corporation to exercise its rights to federal bankruptcy protection partially in light of the seriousness of the Corporation's potential federal obligations with respect to that personal and confidential information.

(4)   *Whether an Alternative Means Exists*

Again, there is an alternative to bankruptcy under state law -- judicial dissolution under O.C.G.A. § 14-2-1430 *et seq.* – but the Plaintiffs have not sought that alternative and, as shown, the State Court is simply not as well equipped as this Court to handle this matter. This factor clearly militates in favor of this Court retaining the exclusive jurisdiction it unquestionably has.

(5)   *Whether Work-Out is Available*

Work-out may in fact be somewhat readily available with the non-insider creditors. Wachovia Bank, for example, apparently is very cooperative. While the Corporation's landlord has threatened to file an action to obtain possession of the premises, this probably is more a matter of the landlord and Mr. Perkins not being able to come to agreement because of the mess the Plaintiffs created, than any kind of dispute requiring the Court's involvement.

The real problems will relate to the claims of the insider creditors. But, this Court is a much better forum than the State Court – particularly for the Corporation as an entity, and for the non-insider creditors. In the State Court, the conflicts among the insiders would take the focus. In this Court, the interests of the non-insiders will prevail over those of the insiders. This is a distinct advantage – to *all* concerned, even the insiders even though they might not like it – of finely-tuned bankruptcy proceedings.

(6)      *Whether a Non-Federal Insolvency has Proceeded Far*

No non-federal insolvency has even been commenced, let alone proceeded so far that there would be duplication of effort.

(7)      *The Purposes for Which Bankruptcy Sought*

The Board decided to seek bankruptcy protection for the Corporation because the Corporation is insolvent, and the Corporation's affairs need to wound up in an orderly manner. The Corporation has been insolvent for some time, and bankruptcy has been under consideration during much of that time. The Plaintiffs' shenanigans in State Court were the proverbial "straw that broke the camel's back" with respect to the timing of the Board's decision.

Certainly any competent attorney would have advised the Board that bankruptcy was a significant option under the circumstances. Clearly, something was amiss when the Plaintiffs obtained unlawful *de facto* prejudgment attachment. It also was and still is clear – from the State Court's own admonitions to get this case resolved some other way, and Mr. Perkins's need to beg the State Court for instructions – that the State Court simply is not capable of handling what Mr. Perkins has aptly described as "an extremely difficult and expensive procedural situation for all concerned."

Federal bankruptcy appears to be the only option that makes any sense.

ii.      *Derivative Claims are Important Assets of the Corporation*

Mr. Perkins states on Page 3 of his Motion that "the Debtor appears to have little or no assets" other than the claims asserted in the State Court action. Mr. Perkins is woefully wrong, as the Corporation has assets that include substantial potential claims against the Plaintiffs, which have yet to be asserted.

The Corporation's assets include claims against Joseph Armenia and Keith Armenia associated with Keith Armenia quitting his position as President of the Corporation, and then the two of them setting up a company that directly competes against the Corporation, and which lured away a number of the Corporation's employees.

The Corporation's assets also include claims against Gary Milkwick associated with Mr. Milkwick's actions in converting substantial funds in the Corporation's checking account with Wachovia Bank, and performing (and charging for) CPA services for the Corporation in violation of his duties to avoid conflicts of interest and to disclose his ownership interest when rendering such CPA services (if it were even permissible to render such services when he had an ownership interest).

The derivative claims already asserted in the State Court, and those existing the Plaintiffs, can best be handled in this Court – and an adversary proceeding might not even be necessary. Among other things, the Georgia Business Corporation Code provides for an independent investigation of the Plaintiffs' derivative claims (as well as the Corporation's claims against the Plaintiffs – which cannot be asserted in the State Court because the Corporation is not a party in that case and cannot be made a party) according to O.C.G.A. § 14-2-744.

The purpose of such an independent investigation is to determine – without expensive litigation – whether it truly is in the Corporation's best interest to pursue the claims that have been asserted (or could be asserted against the Plaintiffs) in the State Court.  The results of the independent investigation are to be reported to the Court to determine whether any of the derivative claims should go forward on the merits.  This decision is based upon an *independent* determination of what is in the best interests of the Corporation.

That independent investigation necessarily involves the Trustee, and her knowledge and judgment on matters important to the estate.  In fact, as the court-appointed independent investigator under O.C.G.A. § 14-2-744(b)(3), the Corporation can think of no better-suited candidate than the Trustee herself.  The Corporation intends to so move (if the Trustee does not object) upon denial of the Motion.

3.    **Summary and Conclusions**

Mr. Perkins has no standing to bring the Motion, and has so conceded within the Motion itself.  The Plaintiffs have engaged in wrongful behavior by seeking to obtain *de facto* prejudgment attachment to which they are not even arguably entitled; the Court should not reward that wrongful behavior by dismissing the Petition.  The Plaintiffs and Mr. Perkins have fomented a series of "trial by ambush" "emergency" hearings trying to force the Corporation to abandon the Petition (at the risk of contempt sanctions against the Chairman of the Board), and should not be rewarded for their egregious violations of the automatic stay.  Even if the Court were inclined to abstain despite the factors that heavily militate against abstention, that would not succeed because the State Court action cannot possibly move forward in light of the fact that the Corporation is an unnamed necessary party that cannot be joined because of the automatic stay, and the defect cannot be cured as there is no basis for relief from stay.

WHEREFORE, Home Equity Loan Products, Inc. hereby respectfully demands that the Motion by William F. Perkins to Dismiss Bankruptcy Case and/or for Abstention be DENIED, and that all costs of responding to said Motion, including but not limited to reasonable attorney's fees, be cast against Mr. Perkins, and the Plaintiffs as his principals.

This 13 day of February_____, 20 06.

Respectfully submitted,

Neil Lovett Wilkinson
Georgia Bar Number 760040
Attorney for Debtor

Paul Troy Wright
Georgia Bar Number 778585
Attorney for Debtor

**WILKINSON & WRIGHT, LLC**
1720 Mount Vernon Road   Suite B
Atlanta, Georgia   30338
(770) 804-0101 Phone
(770) 730-0873 Fax

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CASE NUMBER 06-60429-mhm** |
| **HOME EQUITY LOAN PRODUCTS, INC.** | ) | |
| | ) | **CHAPTER 7** |
| | ) | |
| | ) | **JUDGE MURPHY** |

### CERTIFICATE OF SERVICE

We hereby certify that we have served the foregoing BRIEF IN OPPOSITION TO MOTION TO DISMISS AND/OR FOR ABSTENTION on the below-named counsel via facsimile and by depositing a copy of same in the United States mail in an envelope with sufficient postage thereon addressed as follows:

Courtesy Copy to:

| **Hon. Margaret H. Murphy**<br>Judge, US Bankruptcy Court<br>United States Courthouse<br>75 Spring Street<br>Suite 1290<br>Atlanta, GA 30303<br>(404) 215-1006 | **Martha A. Miller**<br>Martha A. Miller, PC<br>229 Peachtree St. NE<br>Suite 2415<br>Atlanta, GA 30303<br>(404) 607-9008<br>(404) 607-9068 (fax) | **R. Kyle Woods**<br>300 Galleria Pkwy.<br>Suite 960<br>Atlanta, GA 30339<br>(770) 956-8202<br>(770) 955-6654 (fax) |
| **John T. Vian**<br>Smith, Gambrell & Russell, LLP<br>1230 Peachtree St. NE<br>Suite 3100<br>Atlanta, GA 30309<br>(404) 815-3543<br>(404) 815-3509 (fax) | | |

This 13 day of February, 20 06.

Respectfully submitted,

Neil Lovett Wilkinson
Georgia Bar Number 760040
Attorney for Debtor

_____
Paul Troy Wright
Georgia Bar Number 778585
Attorney for Debtor


**WILKINSON & WRIGHT, LLC**
1720 Mount Vernon Road   Suite B
Atlanta, Georgia   30338
(770) 804-0101 Phone
(770) 730-0873 Fax

Filed In Office Jan-19-2006 14:04:54
ID# 2006-0007265-CV
Page 1

*Jay C. Stephenson*

Jay C. Stephenson
Clerk of Superior Court Cobb County

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

JOSEPH P. ARMENIA, KEITH J.   )
ARMENIA, and GARY E.   )
MILKWICK directly and derivatively )
on behalf of HOME & EQUITY   )
LOAN PRODUCTS, INC.,   )
  )
       Plaintiffs,   )
  )
v.   )
  )
DAVID W. HUFFMAN,   )
STERLING G. WHARTON,   )
RONALD A. BAKER, JAMES D.   )
CUNNINGHAM, ROGER   )
DONAHUE, and DREAM   )
AVENUE MORTGAGE CORP.,   )
  )
       Defendants.   )
_____)

CIVIL ACTION FILE NO.
05-1-10245-42

## TEMPORARY RESTRAINING ORDER AND
## ORDER APPOINTING RECEIVER

The above-styled case having come before this Court on Plaintiffs'

Emergency Motion for a Temporary Restraining Order and for Appointment

of a Receiver, and proper notice having been furnished to all of the above-

named parties, and the Court having heard arguments from Plaintiffs Joseph

P. Armenia, Keith J. Armenia, and Gary E. Milkwick, and Defendants David

W. Huffman, Ronald A. Baker, and Dream Avenue Mortgage Corporation, it

is hereby ORDERED and ADJUDGED as follows:

ID# 2006-0007265-CV
Page 2

1.   The Court hereby appoints William F. Perkins of W.G. Hays &
     Associates, LLC, 1100 Spring Street, Suite 450, Atlanta,
     Georgia 30309, (404) 602-4835, as the receiver to supervise,
     oversee, and analyze the business operations of Home Equity &
     Loan Products, Inc. ("HELP") and Dream Avenue Mortgage
     Corporation ("Dream Avenue");

2.   Defendants must immediately cooperate with the receiver;

3.   Defendants are hereby restrained from the following actions:

     (a)   misappropriating, converting, transferring, or otherwise
           using or depleting the intellectual, intangible, and
           tangible assets and property of HELP or Dream Avenue
           except in furtherance of the companies' business affairs;

     (b)   misappropriating, using, transferring, or disclosing any
           business information of HELP or Dream Avenue except
           in furtherance of the companies' business affairs;

     (c)   soliciting or attempting to solicit, whether individually or
           through any other entity, any customers or prospective
           customers for any entities other than HELP or Dream
           Avenue;

- 2 -

(d)     destroying any business information of HELP or Dream

Avenue including e-mails, documents, or information

stored on any computer owned by HELP or Dream

Avenue, or on any computer which was located in the

premises occupied by HELP or Dream Avenue as of

January 6, 2006, which relate to any party in this matter

or issue raised in Plaintiffs' Complaint or in any

Answers, Defenses, and/or Counterclaims which may be

asserted; and

(e)     interfering with the existing, prospective, or potential

business relationships of HELP or Dream Avenue, or

otherwise contacting any existing, prospective, or

potential clients of HELP or Dream Avenue.

SO ORDERED this __19__ day of January, 2006.


_____
HON. ADELE L. GRUBBS
Judge, Superior Court of Cobb County


- 3 -

Prepared and presented by:


/s/ Michael J. Jacobs _____ _____
Jeffrey D. Horst
Georgia Bar No. 367834
Michael J. Jacobs
Georgia Bar No. 388288
Krevolin & Horst, LLC
100 Colony Square, Suite 2150
1175 Peachtree Street, N.E.
Atlanta, Georgia 30361
(404) 888-9700
(404) 888-9577 (facsimile)

*Attorneys for Plaintiffs*

IN THE SUPERIOR COURT OF COBB COUNTY
COBB JUDICIAL CIRCUIT
STATE OF GEORGIA

JOSEPH P. ARMENIA,            )
KEITH J. ARMENIA, ET AL       )
                              )
        Plaintiff             )
                              )
Versus                        )    Case Number:
                              )
DAVID W. HUFFMAN,             )    05-1-10245-42
STERLING G. WHARTON, ET AL    )
                              )
        Defendant             )
                              )

ORDER

The transcript of the proceedings before the

HONORABLE ADELE L. GRUBBS, on January 6, 2006, at

the Cobb County Courthouse, Marietta, Cobb County,

Georgia.

APPEARANCE OF COUNSEL:

FOR THE PLAINTIFFS:          JEFFREY D. HORST
                             Attorney-at-Law

FOR DEFENDANT DREAM AVENUE:  ALBERT E. JONES
FOR DEFENDANT BAKER:         MICHAEL R. HIRSCH
FOR DEFENDANT HUFFMAN:       PRO SE
                             Attorney's-at-Law

Paul D. Crowder,
Certified Court Reporter

```
1                  P R O C E E D I N G S

2                      *  *  *  *  *

3          MR. HORST:  May I proceed, Your Honor?

4          THE COURT:  Yes.

5          MR. HORST:  Thank you.  The initial board consisted

6    of West, John West, Ron Baker, Gary Milquick (ph), Dr.

7    Joseph Armenia and Keith Armenia.  So, three of whom I

8    represent are Gary Milquick (ph), Dr. Joseph Armenia and

9    Keith Armenia.  They were originally Directors of

10   H.E.L.P.  Keith Armenia also served as the Vice-

11   President.  Gary Milquick (ph) served as the

12   Treasurer/CFO.

13         On the chronology we've got the respective capital

14   contributions that my clients made; Mr. Milquick (ph)

15   fifty-five thousand, Dr. Joseph Armenia, forty-four

16   thousand.  And in return for that Milquick (ph) got 20

17   percent of the shares, Dr. Armenia got 8 percent of the

18   shares and Keith Armenia, who received shares in exchange

19   or, if he was working for the company, received 12

20   percent of the shares.

21         The company started operations in early 2002.  It

22   also received start-up capital by obtaining a loan from

23   Wachovia Bank through a one-hundred-seventy-five-dollar

24   installment note and a twenty-five-thousand-dollar line-

25   of-credit.  Through 2003, the company had positive net
```

1    income.  And then problems began surfacing in September

2    of 2004, where David Huffman entered into a stock

3    purchase agreement with Mr. West to acquire West's shares

4    in H.E.L.P.    And West owned about 40 percent of the

5    company.  And Huffman agreed to pay West ninety-six-

6    thousand dollars over the course of about four years, at

7    the rate of two-thousand dollars per month.  Huffman made

8    two of the installments and then stopped paying anything

9    to West.  Huffman then transferred half of his shares

10   that he acquired, about 20 percent, to Sterling Wharton.

11   And then together with Ron Baker, one of the Defendants

12   who was a close friend and associate of David Huffman's,

13   they then owned or controlled 60 percent of the stock

14   and, therefore, had control.

15        In October, on October 4th, they proported to have a

16   special meeting to shareholders and Directors.  Although

17   West and Huffman, excuse me, the Huffman and Wharton

18   shares had not yet been transferred from West.   On

19   October 5, Huffman and Wharton got a Sheriff to try to

20   help them take over H.E.L.P.'s corporate headquarters and

21   seize control.  That was not successful because the

22   transfer had not yet taken place.

23        The transfer occurred on October 6, 2004, where

24   Huffman and Wharton were issued their shares.  A special

25   meeting was then held by, called by them for October

1    22nd.   And at that meeting, on October 22nd, the old

2    guard was shoved aside and the new guard was brought in.

3    And Milquick (ph) and Dr. Joseph Armenia were ousted from

4    the board.   Keith Armenia was ousted as President and

5    then as a board member.   Mr. Huffman became the President

6    of H.E.L.P.   Mr. Wharton became the CEO of H.E.L.P.   And

7    the other three named Defendants, Donahue (ph),

8    Cunningham and Baker were named to the Board of Directors

9    in addition to Huffman and Wharton.

10        None of these people had any experience in the

11    mortgage lending business at all.   One of the first

12    things that happened was the Wachovia line-of-credit,

13    which had been used but had a zero balance at the time of

14    the take-over, Huffman wrote two checks on the same day

15    that caused the line-of-credit to be overdrawn by about

16    fifteen-thousand dollars.   Which, of course, precipitated

17    a default of the line-of-credit, which also precipitated

18    a default of the one-hundred-and-seventy-five-thousand-

19    dollar note.

20        There was, also, a default caused as a result of the

21    change in control by H.E.L.P., that Huffman precipitated.

22    Then, eight days later, Huffman closes H.E.L.P.'s account

23    at Wachovia and then ultimately stops making the Wachovia

24    payments all together.   So, one of the things that has

25    happened, Judge, which is later on the time line, is that

- 4 -

1    Wachovia has sued Mr. Milquick (ph) and his wife because

2    they signed personal guarantees on the debt for H.E.L.P.

3    And there is a lawyer here on the behalf of Wachovia

4    because, as you might imagine, they also have an interest

5    in seeing what's going on with H.E.L.P.

6        After the take-over, Huffman and his family members

7    and Wharton ran the company and did things like use Dr.

8    Milquick (ph) and Dr. Joseph Armenia's credit cards

9    without their permission.  They signed employment

10   agreements creating substantial liabilities for H.E.L.P.

11   They hired family members who didn't have the competency

12   of working the mortgage lending business.

13       The board, the new board doesn't have regular

14   meetings and exercises no oversight or monitoring

15   responsibilities.  They cancelled the annual shareholders

16   meeting in 2005.  And then, another thing that happened

17   was, at the beginning of 2005, after the company had not

18   required any additional capital contributions for over

19   thirty months from the shareholders and had reduced the

20   Wachovia line-of-credit to zero, they communicate to my

21   people that, �※Well, the company is broke and you guys

22   need to contribute a hundred-thousand dollars in order to

23   preserve your respective share ownership and help us pay

24   off the company's obligations.�※

25       When our clients declined to do that, when my

- 5 -

1    clients declined to do that, they are informed that their

2    respective share ownership has been decreased by about 75

3    percent.  As I mentioned, on June 10, 2005, Wachovia

4    filed a lawsuit against my client, Gary Milquick (ph) and

5    his wife, to collect on H.E.L.P.'s obligations under the

6    Wachovia note and line-of-credit.  So what we do is we

7    start trying to get information from H.E.L.P. as to

8    what's going on with the company because this lawsuit has

9    been filed against us.

10   So the first thing that we do is to send a letter on

11   July 26th, under the corporate code section that allows

12   the shareholders to do an inspection of records.  And, if

13   I may hand this up to you, Your Honor.

14   (Presenting)

15   MR. HORST:  And we asked to receive a number of

16   corporate records including financials and Board Meeting

17   Minutes and Shareholder Meeting Minutes and things of

18   that nature.  On July 26th, we don't get a response, --

19   Under the corporate code, they have five days to respond.

20   They didn't.  We followed up.  They continued not to

21   respond and ignored us.  So, on August 9th, we sent a

22   letter to all of the Directors, excuse me, to Wharton and

23   Huffman on behalf of the company saying, ※We think there

24   is a lot of wrongful things going on under your control

25   of the company and we are making a demand on the company

- 6 -

1  pursuant to the Georgia Corporate Code, that you remedy

2  these problems. If I may, Your Honor, approach.

3      (Presenting)

4      MR. HORST:  Thank you.  And that's the letter we

5  sent on August 9th, making the demand on the company and

6  the Directors to take certain action.  That was, that

7  letter was ignored by everybody.

8      On August 17th, we get a response from David

9  Huffman, in response to our request for the documents.

10  And he produces a couple of documents but most of them

11  they declined to produce including any of the financial

12  records for H.E.L.P., for 2005.  And that response was

13  sent out on August 17th.  We later find out that on

14  August 18, the very next day, a company called Dream

15  Avenue was incorporated by David Huffman.  If I may, Your

16  Honor, hand up the Secretary of State's records.

17      (Presenting)

18      MR. HORST:  And Dream Avenue Mortgage Corporation is

19  in the exact same business as H.E.L.P.  And, according to

20  the Secretary of State's records, it had the same office

21  as H.E.L.P. had; 975 Cobb Place Boulevard, Kennesaw,

22  30144.  And Suite 312, which is where H.E.L.P.'s offices

23  were when H.E.L.P. was being run by, originally my

24  clients, and then by Mr. Huffman and Mr. Wharton.

25      On November 28, we sent a letter to Huffman,

1    following up on the document production request, and we

2    are still unaware of Dream Avenue at this point, saying

3    we need these documents particularly the financial

4    records because we have no idea what is going on with

5    H.E.L.P.  You cancelled the shareholders' meetings.  So,

6    we have no ability to determine the status is of the

7    company, how it's operating, things of that nature.

8         And then, the very next day, we get, or the very

9    next day Mr. Huffman sends out a letter that tells us

10   that he is shutting down H.E.L.P.  And if I may approach,

11   Your Honor, and pass up Mr. Huffman's letter.

12        (Presenting)

13        MR. HORST:  And this November 29th letter, from Mr.

14   Huffman, which he signed as the President of H.E.L.P.,

15   has a number of interesting things in it.  He begins by

16   saying, ✻After running H.E.L.P. for one year, I have

17   decided that the company cannot continue.✻  And he goes

18   on to talk about what happened after he took over the

19   company and how there were all these various problems.

20   All of which was news to us.  And he's decided that's in

21   the best interest of the company to shut it down.

22        What's also interesting about this letter, Your

23   Honor, is that at the bottom of the page he said, ✻In an

24   effort to mitigate losses as President of H.E.L.P., I

25   have agreed to sublet the office space and the equipment

1   to a third party called Dream Avenue Mortgage

2   Corporation.※  At no point did he disclose to us that he

3   owned and controlled and had incorporated Dream Avenue.

4   He just says, ※Well, Dream Avenue is going to operate out

5   of the same space and we'll make the lease payments.※

6       He then goes on, in the second page of the letter,

7   to say, ※Dream Avenue is not going to be responsible to

8   Wachovia or the shareholders for those certain debts to

9   Wachovia or for any of the company's debts.※  This is at

10   the beginning of the second paragraph of the second page.

11   He then goes on to say, ※I expect the company H.E.L.P. to

12   pay all regular debts in winding up things.※  Well he

13   knew that clearly wasn't true because he's already said

14   on the first page that the company didn't have any

15   assets.

16       And so, and I've just been informed that, although

17   H.E.L.P. was represented in the Wachovia case by Mr.

18   Jones, Mr. Jones has just informed me a few minutes ago

19   that he has filed a Withdraw from representing H.E.L.P.

20   in the Wachovia case because it doesn't have any assets.

21   And he's now here today representing Dream Avenue.

22       So, clearly, what has happened here is all of the

23   assets of H.E.L.P., its employees, its equipment, its

24   corporate opportunities, its relationships with its

25   lenders and with its clients and with its venders have

- 9 -

1    all been transferred by Mr. Huffman to this new entity of

2    which none of my clients own any interest.  And it's

3    stuck my clients, particularly Mr. Milquick (ph), with

4    having to deal with the Wachovia lawsuit where he's got

5    potential exposure because of the personal guarantee he

6    signed.

7        It's also potentially stuck Wachovia because, of

8    course, H.E.L.P. has the first obligation to Wachovia to

9    pay down on the line-of-credit and the Wachovia note.

10   And it also, to the extent there are other creditors out

11   there, it is also going to deprive them of any

12   opportunity to recover from H.E.L.P.  So, what we believe

13   has happened is that he has simply transferred over from

14   H.E.L.P. to Dream Avenue all of the assets of H.E.L.P.,

15   which he owns by himself.  We have some evidence to that,

16   Your Honor.  If I may hand up, with Your Honor's

17   permission, a printout from the Department of Banking and

18   Finances website.

19        (Presenting)

20        MR. HORST:  Which, on the left-hand side has a

21   license number, 17028, for Dream Avenue Mortgage

22   Corporation.  That is the license number for H.E.L.P.  So

23   apparently, what Mr. Huffman has done is simply

24   transferred all of the assets, including the license with

25   the D.B.F., over to Dream Avenue without any

1    compensation, that we are aware of, to H.E.L.P. at all.

2         So, that's why we're here, Judge, is that --

3         THE COURT:  What are you asking the Court to do?

4         MR. HORST:  We are asking the Court to appoint a

5    receiver to take over the operations of H.E.L.P. and also

6    to take over the operations of Dream Avenue because we

7    believe that Mr. Huffman has totally deprived H.E.L.P. of

8    any of its assets, as I have said, including any revenue

9    producing opportunities that it might have with clients

10   or customers.  And if a receiver simply goes in and looks

11   at the operations of H.E.L.P., there is not going to be

12   any assets there to pay the receiver's expenses, for

13   example, or to potentially even resurrect the company.

14        And we think everything has been transferred; the

15   lease, the employees, the assets, the customer

16   relationships, probably the revenues from August 2005

17   forward when he incorporated H.E.L.P., excuse me, when he

18   incorporated Dream Avenue over to Dream Avenue.

19        THE COURT:  You've asked for a T.R.O. What are you

20   asking in the nature of a T.R.O.?

21        MR. HORST:  Your Honor, I've got a proposed Order.

22   If I may hand it up, Your Honor.

23        (Presenting)

24        MR. HORST:  And a number of the things are the

25   things that you would expect that we would seek, which is

- 11 -

1    the preservation of documents and computers and records

2    and things like that.  But, most importantly, we want a

3    receiver to be appointed to oversee the operations of

4    H.E.L.P. and Dream Avenue.  And then to require the

5    Defendant's to cooperate with the receiver, the

6    Defendant's to pay the receiver's invoices immediately

7    upon receipt, to pay our attorney's fees for the

8    necessity of having to get the appointed receiver

9    pursuant to O.C.G.A., Section 9813.

10    And then to restrain the Defendant's from doing the

11    following things, which are:  continuing to

12    misappropriate, convert, transfer or otherwise use or

13    deplete H.E.L.P.'s assets; misappropriate, use, transfer,

14    disclose H.E.L.P.'s business information except in

15    furtherance of H.E.L.P.'s business; solicit H.E.L.P.'s

16    customers or prospective customers; destroy any business

17    information of H.E.L.P. or Dream Avenue including e-

18    mails, computer stored information, things of that nature

19    or to interfere with H.E.L.P.'s --

20    THE COURT:  I've looked at this.  Some of this is

21    not going to work.  You have a proposed receiver in mind?

22    MR. HORST:  Someone mentioned the name to me of a

23    receiver, Your Honor.  I don't know the person but

24    apparently he's been appointed a receiver by Court's and

25    by the Bankruptcy Court's out here.  His name is Jeffrey

1    Kerr (ph).  I have a copy of his resume.  If you would

2    like me to hand that up.

3         (Presenting)

4         MR. HORST:  Like I said, I've never talked to him.

5    I don't know him personally.  Somebody just said that one

6    of the other Cobb Superior Judge's appointed him, I think

7    in 2005, to serve as a receiver.

8         THE COURT:  Okay.

9         MR. HORST:  Unless you have other questions --

10        THE COURT:  Response?  Response of who is going

11   first for the Defendant.  We've got three Defendants.

12   One represented and not present.  We have one that is

13   unrepresented and is present and two that are

14   represented.

15        MR. HUFFMAN:  Can I go first?

16        THE COURT:  You want to go first, Mr. Huffman?

17        MR. HUFFMAN:  Yes, Ma'am.

18        THE COURT:  Okay.

19        MR. HUFFMAN:  My name is David Huffman.  I am

20   appearing Pro Se.  And I can speak from experience as

21   President of Home Equity Loan Products.  It sounds like

22   this David Huffman is a pretty awful character and I'd

23   like to --

24        THE COURT:  Okay.  You're not testifying.  You are

25   talking only as if you were a lawyer.

1          MR. HUFFMAN:  Yes, Ma'am.

2          THE COURT:  I need to make that clear.  Go ahead.

3          MR. HUFFMAN:  Okay.  First of all, Home Equity Loan

4     Products, financial records will show, has been insolvent

5     since the end of 2002, unto its present state.  It has

6     never turned a profit to date and has always had

7     liabilities exceeding its assets.  In fact, to the amount

8     of over three-hundred-thousand dollars.  The original

9     managers, West, Milquick, Armenia and Baker spent all the

10    funds that they raised through loans and kept

11    contributions in the first twelve months.

12         When I came into the picture, at the later part of

13    2004, they originally asked me to consult with them on

14    how to fire John West, who was the 40 percent

15    shareholder.  I advised them, as a consultant at that

16    time, that if they fired John West, they should go

17    purchase his shares and treat him fairly.  The Board

18    Minutes of Home Equity Loan Products, in the later part

19    of 2004, demonstrate on three different cases where Mr.

20    Milquick (ph) was instructed by the Board to purchase Mr.

21    West's shares.  He refused to do so.

22         The failure of Mr. Milquick (ph) to purchase Mr.

23    West's shares at any price also prompted a letter in July

24    26, 2004, which comprises my single piece of evidence if

25    I might approach.

- 14 -

1        (Presenting)

2        THE COURT:  Surely.  Just give it to the Clerk.

3        MR. HUFFMAN:  This letter was signed by all of the

4    Board Members and all of the shareholders of Home Equity

5    Loan Products, in July of 2004.  Among other things, it

6    testifies or gives evidence that Home Equity Loan

7    Products is worth nothing.  All the shareholders signed

8    this, said that the value of the company was nil.  When I

9    came in to play, the company was worth nothing and I

10   purchased, from Mr. West, on a note and cash basis, 40

11   percent interest in the company.  Along with Mr. Baker's

12   shares, we control the company.  And I ran the company

13   from the later part of 2004 to the later part of 2005.

14       I have not received any salary for running the

15   company.  I have invested over forty-thousand dollars in

16   cash in running the company.  The parties became

17   estranged and communication broke down.  We have provided

18   financial information in accordance with Georgia Statues,

19   at the end of each year, and other information to the

20   best of our ability as we were required to furnish.

21       But in taking over the company in the end 2004, Mr.

22   Keith Armenia, who was the General Manager and in

23   violation of his Non-Compete and Non-Solicitation

24   Agreement, left the company, started another company and

25   solicited valuable and key employees from Home Equity

- 15 -

1   Loan Products.  Mr. Milquick (ph), who is in the

2   courtroom today, also failed to provide financial

3   information and had to seek assistance from Georgia

4   Society of CPA's in order to receive the records in order

5   to continue the company.  Mr. Milquick (ph) also went to

6   the bank and closed the corporate checking account and

7   moved the funds, in another attempt to sabotage the

8   company.

9       After operating the company for approximately a

10  year, with all the factors involved and the position of

11  the company being focused in the refi market, which

12  became prevalent after 2001, 9/11 incident, the refi

13  market was very active and a lot of mortgage companies

14  opened up.  And that time is over.  I decided that I was

15  in a situation where Home Equity could not continue to

16  operate.  I knew Home Equity had obligations to the

17  landlord and other obligations.

18      And so I was in a quandary as to shut the company

19  down or try to continue, not making any salary, not

20  paying my wife any salary, putting more money into the

21  company, I chose to start another company called Dream

22  Avenue Mortgage.  I have a lease agreement with that

23  company to pay market price for the use of the equipment

24  and any other benefits that it derived.  I have that

25  lease agreement here, if I might approach.

1      (Presenting)

2      MR. HUFFMAN:  This agreement, among other things,

3      agrees that Dream Avenue will pay a lease amount of fair

4      market value as estimated.  That the equipment and the

5      assets on-site approximate twenty-five-thousand dollars.

6      That lease agreement is believed to be for market value.

7           As far as the license agreement, I approached the

8      Georgia Department of Banking and Finance and asked them

9      what they would do under this circumstance and they said

10     that the most feasible thing to do was transfer the

11     license of Home Equity Loan Products to Dream Avenue.

12     According to the laws and regulations of Georgia

13     Department of Banking and Finance, you cannot operate two

14     companies at the same time.  So the reason for that was

15     at their instruction to take that license and move it

16     over.

17          It became my decision, in the later part of 2005, to

18     close Home Equity Loan Products because it was mis-

19     positioned in the market.  As you might have guessed,

20     Home Equity Loan Products sounds like a second mortgage

21     company or a company that provides home equity loan

22     lines-of-credit.  We do not do that any longer.  We were

23     not focused in the refi market.  Dream Avenue is an

24     entirely different business.  It operates with Realtors'

25     and purchases, not refinanced mortgages.  It operates in

1   the local market.  We develop a product to their software

2   to track and monitor our prospects.

3       Save one, there is one original employee of Home

4   Equity Loan Products, a commission person that works with

5   Dream Avenue.  None of the original employees are working

6   for Dream Avenue.  None of the assets have been subverted

7   or dissipated.  All funds have been kept separate and

8   separate accounting has been made for them.  There has

9   been no co-mingling of the funds.  Dream Avenue is a

10   separate entity, duly incorporated.  Shares have been

11   issued so that there is no co-mingling.

12       I am not opposed, if the Court sees fit, to have

13   Home Equity Loan Products placed in a receivership

14   because I can no longer manage that for free without

15   making anything.  There are no funds there.  My

16   contention is that the receiver will find that Home

17   Equity Loan Products had been insolvent for many, almost

18   since its inception and it is due for liquidation.

19       In order for there to be any residual benefit to

20   Home Equity, Dream Avenue needs to remain viable so we

21   can continue its business.  It has approximately eighteen

22   employees.  The need to continue to be able to provide

23   for their families and it can provide a benefit to Home

24   Equity Loan Products and to these minority shareholders

25   by paying the rent on the premises, lease on the

1    equipment and benefitting them in any way equitable for

2    any benefit that Dream Avenue receives.

3         In summary, I would just say that I have not

4    benefitted personally.  You don't generally wrestle a gun

5    away from someone and shoot yourself in the foot.  The

6    company was insolvent.  After I found that out, I

7    continued to put forth my best efforts, which I think,

8    for almost a year, it is something that most people

9    wouldn't have done.  And I continue to desire to benefit

10   the shareholders of Home Equity Loan Products in the best

11   way that I know how.  Thank you very much.

12        THE COURT:  Thank you, Mr. Huffman.  Who's next?

13   You represent?

14        MR. HIRSCH:  Ron Baker, Your Honor.

15        THE COURT:  Oh, Baker.  Excuse me.  I keep wanting

16   to call him Barker.  His name is Baker.

17        MR. HIRSCH:  All right.  Your Honor, as to Mr. Baker

18   and the request for a receiver to be appointed, we don't

19   particularly have an opinion one way or the other.  But,

20   I'm a little concerned about, in the request for relief

21   in the tendered Order, that some of the injunctive-type

22   relief is problematically broad.  For instance, assuming

23   counsel was primarily concerned with computers belonging

24   to H.E.L.P., it's just any other computers, well, that

25   would include, for instance, Mr. Baker's home PC.  And

1    just one of the problems --

2         THE COURT:  Whatever I do, whichever way I go, I'm

3    not going to do this Order because there are things in it

4    I don't like.

5         MR. HIRSCH:  Okay.  And I just wanted to make sure

6    there if nothing else --

7         THE COURT:  You just don't want anything done

8    against him personally.

9         MR. HIRSCH:  That's right.  It also asked for

10   attorney's fees with not really any specific --

11        THE COURT:  We're not doing attorneys' fees on an

12   emergency T.R.O.

13        MR. HIRSCH:  All right.  And basically, anything

14   that might personally implicate Mr. Baker, that's where,

15   obviously, we would have a particular concern.

16        THE COURT:  I thought you would.

17        MR. HIRSCH:  Other than that, I'm done.  Thank you,

18   Your Honor.

19        MR. JONES:  I am --

20        THE COURT:  Melissa -- Wait one second.

21        MR. JONES:  Oh, I'm sorry.

22        THE COURT:  Who is the receiver in that Federal?

23   Can you go find that for me?

24        MELISSA:  I don't know but I can look it up for you.

25        THE COURT:  Can you go find it for me if you will?

1          MELISSA:  Yes, sure.

2          THE COURT:  Yes.  Sorry Mr. Jones.

3          MR. JONES:  I represent Dream Avenue, the subsequent

4     company.

5          THE COURT:  Do you have something in your throat?

6          MR. JONES:  I have a little raspy voice.  I had

7     surgery some years ago on my neck and that is what it

8     left me with.  I'm sorry.  It didn't make me taller and

9     it gave a little more hair.

10          THE COURT:  It doesn't matter.  I just want to cough

11     for you.  Go ahead.

12          MR. JONES:  It doesn't bother me and I apologize if

13     it makes you uncomfortable.

14          THE COURT:  It doesn't bother me.  It's all right.

15     I quit that urge.

16          MR. JONES:  Essentially what we're here today for is

17     to oppose the appointment of a receiver for this start-up

18     company.  If the facts could be fully developed, which I

19     know they can't be --

20          THE COURT:  It's just an evaluation.

21          MR. JONES:  There's just no way to do that.  I think

22     if they could be, I think the Court would feel

23     comfortable that there is a basis to take action relative

24     to H.E.L.P.  It needs to have some help.  And a receiver

25     would be an appropriate remedy to put in place there.  As

- 21 -

1    far as the new start-up business, it's albeit at first

2    blush, if you look at it and don't go under the surface,

3    it might look like it's a company that was organized just

4    to take over.  When, in fact, it really isn't.  It's a

5    company that really is approaching a different market

6    from what H.E.L.P. approached.

7        Typically, in situations like this, I think the

8    Court exercise the extraordinary remedy of appointment of

9    receiver has to find some extraordinary circumstances.

10   In this case, if you go below the surface, I think what

11   you find is a man who was involved in taking over a

12   business, hoping to make it successful and was

13   unsuccessful, through his best efforts.  Not that he

14   syphoned-off any personal assets or diverted any

15   corporate opportunities that belonged to this

16   corporation, he just did the best he could and was

17   unsuccessful.

18       He now has tried to embark on a new undertaking in

19   hopes to be able to make that successful.  Unfortunately,

20   the reality of it is, if the Court puts a receivership in

21   this new company start-up, there is a very good

22   likelihood that would then cause it to be unsuccessful.

23   Because it is in the infant stages and is very, is not

24   making, generating much income.

25       So, what we would ask the Court to do is to put

1    something in place that protects these minority

2    shareholders in H.E.L.P., but not cause the demise of

3    Dream Avenue.  If a receiver is appointed in H.E.L.P.,

4    that receiver can coordinate with Mr. Huffman and Dream

5    Avenue to monitor it, to receive an accounting and do

6    whatever is necessary to satisfy him that things are

7    being done appropriately and pursuant to the Court's

8    order.  So we would urge the Court to not render

9    receivership of this new dream or it's business.  Thank

10   you.

11        THE COURT:  Anything further, Mr. Horst?

12        MR. HORST:  Just briefly, Your Honor.  I think what

13   you've heard is that --

14        THE COURT:  Everybody agrees that I appoint a

15   receiver for H.E.L.P. --

16        MR. HORST:  Right.  The question --

17        THE COURT:  As long as I don't touch the individual.

18   I got you.

19        MR. HORST:  Well, the individual --

20        THE COURT:  And then the argument is do I appoint

21   one for Dream Avenue.

22        MR. HORST:  Right.  Exactly.  And what you've heard

23   is that Dream Avenue is, well, they try to distinguish

24   the lines of business under the Georgia Test, this is

25   clearly going to be, it's in the line of business.  That

1   clearly these guys' controlling H.E.L.P. could have gone

2   on to develop that line of business for H.E.L.P.  And the

3   problem we've got is that, you heard from Mr. Huffman's

4   own words is that H.E.L.P. doesn't have anything.  So if

5   you appoint a receiver just for H.E.L.P., there is not

6   going to be any assets there to pay for the receiver.

7        And Dream Avenue was started, apparently, back in

8   August, and has been successful enough to have eighteen

9   employees.  So this is not some little fly-by-night

10  company that somebody is running out of their basement.

11  It's in the same space.  He's using the same employees.

12  We didn't hear from Mr. Huffman what the revenues were

13  for Dream Avenue.  We didn't hear that it's not closing a

14  bunch of loans.  And my guess is that it is pretty

15  successful company if you can afford to have eighteen

16  employees.  That's a lot of people in the mortgage

17  business.

18       So, that is why it is imperative that you appoint a

19  receiver that has the ability to have total access to

20  both the H.E.L.P. books and records and assets as well as

21  to total access to the Dream Avenue books and records.

22  Believe it or not, Judge, the last time got a receiver

23  appointed was five years ago.  And Mr. Huffman was on the

24  other side of that one, too.  And I have some degree of

25  concerns about not having someone appointed by the Court

1    that can report to the Court insofar as what the

2    operations are of Dream Avenue.  And that would also

3    allow the receiver to be compensated by Dream Avenue, for

4    what clearly has been a wrongful diversion of assets and

5    misappropriation of corporate opportunities.

6         Mr. Huffman can stay in place.  He can continue

7    running his business and do the things that he thinks are

8    necessary to run Dream Avenue.  But, you've got to have

9    the receiver there so that there is the influence and

10   power of the Court to make sure that wrongful things

11   aren't continuing to occur and that my clients are going

12   to get stuck on the Wachovia obligation, that H.E.L.P. is

13   going to be rendered totally assetless.

14        THE COURT:  The Court has to determine if there is

15   irreparable harm.  There is probably already irreparable

16   but we'll deal with that.  Threat of Plaintiff's injury

17   outweighs any harm to the Defendant.  Obviously, that's

18   so.  No adequate remedy of law.  That's so.

19        MR. HORST:  Yes.

20        THE COURT:  There is a substantial likelihood that

21   the Plaintiffs's will prevail on the merits.  Mr.

22   Huffman's representing himself, sorry to say, you just

23   made statements that can be used against you, sir.

24        I'm going to appoint a receiver.  I'm going to

25   appoint a William Perkins (ph).  My clerk will get you

1    the address and the numbers and everything.  And the

2    reason I do that he's on another one.  I don't know him

3    except he is working on another one and he's doing a good

4    job and he's doing a fast job.

5        MR. HORST:  That's fine with us, Judge.

6        THE COURT:  Let me make this, you're going to have

7    draw the order, Mr. Horst.  You can take a seat.

8        MR. HORST:  Thank you, Judge.

9        THE COURT:  The receiver is the arm of the Court.

10   It is not an arm of any of the parties.  And I say that

11   because I've had trouble with that.  Sometimes the

12   Plaintiff feels like the receiver is the arm of the

13   Plaintiff, it's not.  The receiver is the arm of the

14   Court.  The receiver, in this case, will be the receiver

15   for Home and Equity Loan Products and Dream Avenue

16   Mortgage Corporation.

17        We have a transfer, that Mr. Huffman admits, that

18   violates all the corporate law I know and is highly

19   improper and has --

20        No you do not get to say anymore, Mr. Huffman.  You

21   are not in charge.  You need to understand that.

22        -- that will take over, the receiver will take over.

23   The parties will provide all documents to do with either

24   company including payroll, withdrawal of funds, all those

25   kind of things.  Should the receiver feel necessary to

1    get into individual matters, we will.  But we are not

2    going to do that right this minute.)

3        Dream Avenue will continue to operate.  It's not in

4    the intent of the Court to shut it down.  It will

5    continue to operate but every piece of paper it produces

6    will be subject to review by the receiver.  In other

7    words, you can't shut it down and start another one.

8    That needs to be clear.  All paperwork, and I'm talking

9    financially, I don't care what it is, is available to

10   that receiver but you continue to operate.  You continue

11   to have your employees, all the Defendants must cooperate

12   and the Plaintiff's, of course, must cooperate with the

13   receiver.

14       I'm not going to order attorneys' fees.  I am going

15   to restrain the Defendants from doing anything else to

16   deplete H.E.L.P.)  Now, if I am believing the Defendants'

17   right, there is nothing left to deplete.  But there are

18   certainly assets subject to an apparent lease, which is

19   interesting in itself.  (There is a premises.  None of

20   that is to be depleted in any way whatsoever.  None of

21   their accounts, of either corporation, are to be

22   transferred to any other individual person or any other

23   corporation.  It is to remain exactly like it is.  And if

24   I find something is being funneled by anybody, the Court

25   will take action.  It continues to operate but it's not

1    to be funneled in any other way.

2         So, I will allow 5A and 5B and C.  That's just what

3    I said.  You can't stop soliciting for somebody else,

4    yourself, individually or any of those individually.

5         At this point, the receiver has access to H.E.L.P.

6    computers, Dream Avenue's computers.  That includes any

7    computer, today, right now in that building.  If you move

8    one out, it's going to be subject.  Okay.  But not the

9    individual parties computers at this time.  Now, you can

10   claim the one on your desk as individual, but if it's in

11   the premises, it's not individual.  Okay.  It's part of

12   the premises.  But if it's out of the premises, it's

13   individual for right now.  I have to see what the

14   receiver finds.

15        And E, they can't interfere with H.E.L.P.'s business

16   and I don't want anyone to interfering with Dream

17   Avenue's business either.  I don't want it run into the

18   ground in the process of this.

19        I'm not going to make them return anything right

20   now.  (This Court is asking for, I want a report from the

21   receiver within thirty days.)  See where it stands.  See

22   what the merits of this really are.

23        And nothing is to be removed from computers.  No

24   hard drives are to be played with.  I got that in divorce

25   cases a lot.  None of those.  Anyone starts playing games

- 28 -

1    in this case, gentlemen, and the Court will take action.

2    That needs to be real clear to y'all.

3         I'll let them draw an Order.  I've got to put it

4    down for hearing.  And that is one of the problems I've

5    got.  I am supposed to have a hearing within thirty days

6    on an emergency T.R.O.and receivership.  I'm going to put

7    it tentatively on the 26th of January, at nine o'clock.

8         Obviously, the parties have had a torturous

9    relationship for a while.  It would seem to me, the least

10   expensive way for everybody involved is to submit this to

11   mediation as fast as you can.  And I am not binding

12   anybody to this courts mediation program.  You can go to

13   anybody that you think has got enough sense to mediate.

14   You think of Bill Goodman (ph) and Grant Brantley (ph),

15   those types of caliber type people who can cut through

16   the chase and resolve this thing.  Because, by the time

17   we get through, nobody is going to have any money.  Okay.

18   Just a thought.  I'm not ordering it.  I'm just saying

19   that's what needs to be done.  And the 26th is a

20   tentative date at this point.  Okay.

21        Are there any issues about the order?

22        MR. HORST:  If I may, Your Honor, just go through it

23   quickly to make sure --

24        THE COURT:  No.  Don't do that.  It's on the record.

25   Mr. Crowder can get it for you what I just said.

1     MR. HORST:  Okay.  That's fine.  My only other issue

2    is January 26th, I'm out-of-town that week.

3         THE COURT:  Well, I can't help that.

4         MR. HORST:  Okay.  So --

5         THE COURT:  I don't know what to do with it,

6    gentlemen.  I guess Mr. Jones may be the only one who

7    knows me in here, but I like to do my own work.  I don't

8    like anyone else to do it for me.  I may end up having to

9    do that in this situation because, believe it or not, I'm

10   eventually going to take a vacation.  That may be unheard

11   of.  It's the first time in five years, but I really

12   don't have much choice.  So, we'll just look at where we

13   go from there.

14        (Proceedings are concluded)

15

16

17

18

19

20

21

22

23

24

                    C E R T I F I C A T E

                         -  3 0  -

STATE OF GEORGIA)

COUNTY OF COBB)

    I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to type-written form by me personally; that the foregoing pages 01 through 30 represent a true, correct and complete transcript of the evidence given upon said hearing; and I further certify that I am not of kin or counsel to the parties in the case, am not in the regular employ of counsel for any of the said parties, nor am I anywise interested in the result of said case.

    This the 10th day of December, 2006.

Paul D. Crowder

Certified Court Reporter

Seal B-1579

- 31 -

SERVICE COPY

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

JOSEPH P. ARMENIA, KEITH J.    )
ARMENIA, and GARY E.    )
MILKWICK directly and derivatively )
on behalf of HOME & EQUITY    )
LOAN PRODUCTS, INC.,    )
                )
          Plaintiffs,    )    CIVIL ACTION FILE NO.
                )
v.                 )
                )
DAVID W. HUFFMAN,    )
STERLING G. WHARTON,    )
RONALD A. BAKER, JAMES D.    )
CUNNINGHAM, ROGER    )
DONAHUE, and DREAM    )
AVENUE MORTGAGE CORP.,    )
                )
          Defendants.    )
_____)

## <u>VERIFIED COMPLAINT</u>

Plaintiffs Joseph P. Armenia, Keith J. Armenia, and Gary E. Milkwick

hereby file their Verified Complaint directly and derivatively on behalf of

Home & Equity Loan Products, Inc. ("HELP," and collectively with the

foregoing individual plaintiffs, "Plaintiffs") against Defendants David W.

Huffman, Sterling G. Wharton, Ronald A. Baker, James D. Cunningham,

and Roger Donahue, each of whom is a director of HELP (collectively the

"Officer and Director Defendants"), and Dream Avenue Mortgage

Corporation ("Dream Avenue," and collectively with the foregoing

individual defendants, "Defendants") for breach of fiduciary duties; aiding and abetting a breach of fiduciary duty; gross negligence; securities fraud; civil RICO; misappropriation of corporate opportunities; conspiracy to misappropriate corporate opportunities; piercing the corporate veil/alter ego liability; conversion; tortious interference with business relations; fraud, misrepresentation, and conspiracy to defraud; fraudulent transfers; declaratory judgment; constructive trust; accounting; aiding and abetting a breach of contract; and attorneys' fees.  In support of their claims, Plaintiffs allege, on information and belief, as follows:

## THE PARTIES

1.

Plaintiff Joseph P. Armenia ("Dr. Joseph Armenia") is a resident of Erie County, New York.  His primary residence is located at 4681 Pinecrest Terrace, Eden, New York 14057.

2.

Dr. Joseph Armenia is a minority shareholder of HELP.

3.

Plaintiff Keith J. Armenia ("Keith Armenia") is a resident of Paulding County, Georgia.  His primary residence is located at 63 Norton Drive, Dallas, Georgia 30157.

4.

Keith Armenia is a minority shareholder of HELP and previously served as HELP's President.

5.

Plaintiff Gary E. Milkwick is a resident of Cobb County, Georgia. His primary residence is located at 4173 Arapaho Drive, Powder Springs, Georgia 30127.

6.

Milkwick is a minority shareholder of HELP and previously served as HELP's Treasurer and Chief Financial Officer.

7.

HELP is a corporation organized under the laws of the State of Georgia. HELP's principal place of business is located at 975 Cobb Place, Suite 312, Kennesaw, Georgia 30144. HELP is in the mortgage lending business.

8.

Defendant David W. Huffman is a resident of Cobb County, Georgia. His primary residence is located at 3905 Lindsey Road, Marietta, Georgia 30067.

9.

Huffman is the Chairman and President of HELP, and is part of the group of majority shareholders of HELP. As such, Huffman is a control person of HELP. Huffman also is a control person of Dream Avenue.

10.

Defendant Sterling G. Wharton is a resident of Cobb County, Georgia. His primary residence is located at 134 McDonald Street, Marietta, Georgia 30064.

11.

During times relevant to the allegations in this Complaint, Mr. Wharton was the President, Chief Executive Officer, and a director of HELP, and was part of the group of majority shareholders of HELP. As such, Wharton was a control person of HELP.

12.

Defendant Ronald A. Baker is a resident of Cobb County, Georgia. His primary residence is located at 3495 Hallmark Drive, Marietta, Georgia 30067.

13.

Baker is the corporate Secretary and a director of HELP, and is part of the group of majority shareholders of HELP. At all times relevant to the allegations in this Complaint, Baker has served as corporate Secretary and a director of HELP.

14.

Defendant James D. Cunningham is a resident of Cobb County Georgia. His primary residence is located at 1438 Livingston Drive, Marietta, Georgia 30064. Cunningham is a director of HELP.

15.

Defendant Roger Donahue is a resident of Cherokee County, Georgia. His primary residence is located at 1412 Meadowbrook Way, Woodstock, Georgia 30189. Donahue is a director of HELP.

16.

Dream Avenue is a corporation organized under the laws of the State of Georgia. Dream Avenue was incorporated on August 22, 2005. *See* Certificate of Incorporation, Exhibit 1. Dream Avenue is owned and/or controlled by Huffman. *See* Articles of Incorporation, Exhibit 2.

17.

Dream Avenue, like HELP, is in the mortgage lending business.

Dream Avenue's principal place of business is the same as HELP's: 975

Cobb Place, Suite 312, Kennesaw, Georgia 30144.  Dream Avenue may be

served with process through its registered agent at the following address:

Marshall Jaffe, 3823 Roswell Road, Suite 207, Marietta, Georgia 30062.

## **JURISDICTION AND VENUE**

18.

Defendants are all residents of Georgia and are subject to the general

jurisdiction of this Court.

19.

Venue is proper against all Defendants because Huffman, Wharton,

Baker, Cunningham, and Dream Avenue are residents of Cobb County, and

Defendants committed wrongful acts and caused tortious injuries to be

sustained in Cobb County.

## OPERATIVE FACTS

### Founding of HELP

20.

On or about November 21, 2001, HELP was incorporated in Georgia under the name Home Equity Loan Products, Inc. HELP began its business operations in early 2002.

21.

The initial capital contributions into HELP were as follows: $99,000 from John T. West, $77,000 from Baker, $55,000 from Milkwick, and $44,000 from Dr. Joseph Armenia.

22.

In exchange for these capital contributions and certain professional services contributed to the corporation, West received 40 percent of the initial shares of HELP, Baker received 20 percent, Milkwick received 20 percent, and Dr. Joseph Armenia received 8 percent. Keith Armenia received 12 percent of the shares for contributing his professional expertise to HELP.

23.

The initial board of directors was comprised of West, Baker, Milkwick, Dr. Joseph Armenia, and Keith Armenia. West served as HELP's

first President, Keith Armenia as Vice President, Milkwick as Treasurer and Chief Financial Officer, and Baker as Secretary. Keith Armenia was subsequently promoted to serve as President of HELP and served in that capacity until shortly after the Huffman controlled majority shareholders took control of HELP. Milkwick served as Treasurer/CFO until October 2004, when he was ousted from said position and the board of directors. Baker has served as Secretary through and including the date of this Complaint.

24.

HELP also obtained start-up capital through an installment note (the "Wachovia Note") in the amount of $175,000 and a line of credit in the amount of $25,000 (the "Wachovia LOC") at Wachovia Bank. Milkwick, West, Baker, and their respective spouses each signed personal guaranties on this debt.

25.

HELP had been profitable in 2003 and was positioned to be profitable in 2004 before Huffman and Wharton took control of HELP.

**Stock Purchase Agreement**

26.

On or about September 14, 2004, Huffman, by and through one of his companies called Discovery Technology, Inc. ("Discovery"), entered into a stock purchase agreement (the "Stock Purchase Agreement") with John T. West and Howard M. Hanks to purchase the HELP shares owned by West and Hanks for the sum of $96,000, payable in installments of $2,000 per month starting in November 2004. A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit 3.

27.

By and through Discovery, Huffman subsequently transferred to Wharton one-half of the shares he acquired from West and Hanks.

28.

The shares acquired through the Stock Purchase Agreement enabled Huffman and Wharton to form a group of majority shareholders with Baker, who was a close friend of Huffman, that gave control of HELP to Huffman, Wharton, and Baker.

29.

After acquiring and consolidating their majority stake in the company, the Huffman controlled shareholders of HELP froze the Plaintiffs, who were

- 9 -

the minority shareholders, out of any involvement in the company's business and financial affairs.

30.

As of the date of this Complaint, Huffman, Wharton, and Discovery paid only the first two $2,000 monthly installments due under the Stock Purchase Agreement for the shares acquired from West and Hanks.

### Election of Officers and Board of Directors

31.

Huffman, Wharton, and Baker held an improper and defective special meeting of the shareholders of HELP on October 4, 2004.

32.

Since the West shares had not been properly transferred as of October 4, 2004, Huffman and Wharton were not shareholders of record at the time.

33.

Said meeting also was defective because HELP's bylaws called for ten-day notice of any special shareholder meetings.

34.

Huffman, Wharton, and Baker also held an improper and defective HELP board of directors meeting on October 4, 2004.

35.

Said meeting was called by alleged directors (*i.e.,* Huffman and Wharton) who had not been duly elected by legitimate shareholders of HELP at the time the meeting was held.

36.

Said meeting was not properly noticed to all board members. Dr. Joseph Armenia was a duly elected member of the board of directors and was not notified of the meeting. Also, ten-day notice of the meeting was required under HELP's bylaws. Such notice was not provided to all board members.

37.

On or about October 5, 2004, Huffman and Wharton, who did not hold properly issued HELP shares at the time, showed up unannounced with an armed deputy of the Cobb County Sheriff's Department at HELP's corporate headquarters and attempted to seize control of the premises. This event interrupted HELP's business operations and had a profound negative impact on employee morale.

38.

On October 6, 2004, Huffman and Wharton properly were issued their shares in HELP.

39.

On October 22, 2004, a special meeting of HELP's shareholders was held. Huffman, Wharton, Baker, Cunningham, and Donahue were elected to the board of directors, and Milkwick and Dr. Joseph Armenia were ousted from the board of directors. Huffman subsequently became President of HELP and Wharton was installed as its Chief Executive Officer. None of the Officer and Director Defendants had any experience in the mortgage lending business.

40.

Wharton acknowledged via e-mail that Keith Armenia was a "key" talent within the company. Nevertheless, the Officer and Director Defendants failed to offer Keith Armenia an employment contract that would prevent HELP from losing this key talent.

41.

In separate conversations with Milkwick and Robyn Giles, HELP's office manager at the time, Huffman threatened to terminate Keith Armenia's employment. Once it was clear to Keith Armenia that HELP would be controlled and operated by individuals who had no experience in the mortgage industry and who lacked respect for the existing institutional knowledge and employees already in place at HELP, Keith Armenia

resigned as President.  Immediately thereafter, the majority shareholders

ousted Keith Armenia from the board of directors.

### Improper Financial Transactions

42.

On or about October 4, 2004, Baker went to Wachovia Bank and

changed the signature card for HELP's accounts without prior approval of

the company's board of directors.  Baker attempted to add Huffman and

Wharton to the Wachovia signature card before Huffman or Wharton held

any shares in HELP.

43.

After the October 22, 2004 special meeting of HELP's board of

directors, Milkwick, who had served as Treasurer/CFO for HELP,

transferred signature authority for HELP's accounts at Wachovia to the

company's newly installed management.

44.

On or about November 2, 2004, HELP's line of credit at Wachovia

had a zero balance.  Huffman fraudulently and intentionally wrote two

checks that caused the Wachovia LOC to become overdrawn by $15,000.

45.

From November 2004 through February 2005, Huffman and others

within HELP, including Huffman's son, at Huffman's direction fraudulently

charged Milkwick's American Express credit card, which formerly was used

in operating HELP's business, on multiple occasions in amounts totaling

approximately $11,500.  Milkwick never authorized these fraudulent

charges.

46.

Huffman, Huffman's son, Wharton, and others within HELP at

Huffman's direction fraudulently charged amounts that were owed to one of

HELP's lead vendors, Neighborhood Loans, to Dr. Joseph Armenia's

American Express credit card.  Dr. Joseph Armenia never authorized these

fraudulent charges.

47.

By causing a change in control of HELP, the Huffman controlled

majority shareholders and board of directors also caused a default under the

express terms of the Wachovia Note and LOC.

48.

On or about November 10, 2004, Huffman closed HELP's operating account at Wachovia.

49.

HELP has defaulted on its obligations on the Wachovia Note and LOC by failing to make payments thereon.

50.

HELP's default has caused Wachovia to file a lawsuit against HELP, certain current and former shareholders of HELP including Milkwick, and their spouses, to collect on HELP's obligations under the Wachovia Note and LOC. Said lawsuit is styled <u>Wachovia Bank, N.A. v. Home Equity Loan Products, Inc., et al.</u>, Civil Action File Number 2005A-5525-1 in the State Court of Cobb County.

51.

Approximately $52,000 was knowingly and intentionally misclassified on HELP's financial statements by Huffman or those under his control as "Loans to Gary Milkwick." This affected all of HELP's shareholders in subsequent tax filings by falsely minimizing the reported loss the company had suffered.

52.

This knowing and intentional misclassification of HELP's losses

resulted in material misstatements on HELP's federal and state corporate tax

returns.  These misstatements have exposed the company to potential

liability for fraud under federal and state laws, further endangering the

viability of HELP and harming its shareholders.

53.

HELP also fraudulently reported $8,000 on IRS Form 1099 as

personal income to Milkwick using Milkwick's social security number.  This

amount actually represented fees paid to Milkwick's CPA firm for services

provided to HELP and was duly authorized by HELP's President.

54.

All of these improper financial transactions were perpetuated by

Huffman, Wharton, or others under their control and with the approval or

acquiescence of the Officer and Director Defendants.

**Improper and Fraudulent Share Dilution**

55.

Within approximately three months after acquiring effective control of

HELP, Huffman and Wharton claimed that the company was in desperate

financial condition and implemented a scheme to force Plaintiffs to invest more money or face dilution of their ownership in HELP.

56.

Pursuant to a note purchase agreement (the "Note Purchase Agreement") dated on or about January 21, 2005, and created by Huffman, Wharton, or those under their control, Plaintiffs were requested to buy senior secured promissory notes (the "Notes") for value from HELP to preserve their respective percentage ownership in HELP. A true and correct copy of the unexecuted Note Purchase Agreement is attached hereto as Exhibit 4.

57.

At the time the Officer and Director Defendants took control of HELP, no new financial contributions from shareholders had been necessary for over 30 months and the balance on the Wachovia LOC had been reduced to zero. Within three months after taking over, the Officer and Director Defendants had caused HELP's financial condition to substantially deteriorate forcing them to seek additional capital. The shareholders of HELP were informed that their additional investments were necessary to relieve the debts and losses of the company. This did not occur.

58.

Participation in the Note Purchase Agreement entitled "investors" to receive one (1) share of newly issued common stock in HELP for every ten dollars invested in Notes.

59.

The Officer and Director Defendants informed Plaintiffs that they would need to invest $100,000 to preserve their percentage ownership in HELP.

60.

Huffman purported to purchase some of the Notes, but in fact paid nothing for them.  As a result, Huffman received additional shares in HELP without paying value for said shares.  Huffman's percentage ownership increased from 20.75 percent to 30.1875 percent.  *See* Exhibit 5.

61.

Wharton purported to purchase some of the Notes, but in fact paid nothing for them.  As a result, Wharton received additional shares in HELP without paying value for said shares.  Wharton's percentage ownership increased from 20.75 percent to 30.1875 percent.  *See* Exhibit 5.

62.

Huffman has communicated to Plaintiffs that their percentage ownership in HELP had decreased as follows:  Dr. Joseph Armenia from 8 percent to 2 percent; Milkwick from 20 percent to 5 percent; Keith Armenia from 12 percent to 3.125 percent.  *See* Exhibit 5.

63.

This conduct by Huffman and Wharton was an improper and fraudulent effort to dilute the Plaintiffs' ownership interest in HELP.

## Failure to Comply with State Laws

64.

The Officer and Director Defendants caused HELP to violate the laws of the State of Georgia governing the mortgage industry, as well as the regulatory laws of other states in which HELP does business.

65.

Huffman and Wharton caused the transfer of more than twenty-five percent (25%) of the shares of HELP without complying with the provisions of O.C.G.A. § 7-1-1008 which requires prior approval of the Georgia Department of Business and Finance ("DBF").  DBF fined HELP $500 for failing to follow this requirement.

66.

HELP changed its officers and directors without notifying the DBF thereby violating O.C.G.A. § 7-1-1006.

67.

In violation of state laws and regulations, HELP closed loans and conducted business without the supervision or involvement of a qualified and licensed mortgage professional, prepared fraudulent financial statements substantially understating income statement losses, failed to conduct or complete background checks on its principals and other new hires, and failed to timely satisfy education and experience requirements for mortgage professionals.

**Improper Management Practices**

68.

At the time the Officer and Director Defendants assumed control of HELP, the company was viable and profitable.

69.

None of the Officer and Director Defendants had any business experience in the mortgage industry prior to assuming their positions at HELP.

70.

The minority shareholders were informed that, upon the resignation of Keith Armenia as President of HELP, the company would search for a suitable replacement with comparable education and experience.  No such search occurred, and no such replacement was hired.  Instead, Wharton and/or Huffman assumed the position of President of HELP.

71.

Although they had no experience in the mortgage lending business, Huffman and Wharton forced HELP to sign a management agreement and an employment agreement with them, which caused HELP to incur substantial liabilities.

72.

Upon taking control of HELP, Huffman proceeded to "clean house" in Keith Armenia's former office at HELP's corporate headquarters by removing, throwing away, and destroying records and documents contained in the office without regard to their importance and without a proper review thereof.  Many of these records and documents were vital to the operation of the company.

73.

The new management of HELP subsequently hired non-competent family members of Huffman, including his wife, Barbara Huffman, and his son, John David Huffman. HELP paid and accrued salaries and benefits to Huffman, his family members, and Wharton disproportionate to the value of the services provided to HELP.

74.

The Officer and Director Defendants have failed to pay employees of HELP salary, commissions, and other amounts that were due and owing to said employees for their services. Huffman also has treated employees of HELP abusively. As a result, valuable employees have terminated their employment with the company, and HELP has had difficulty attracting and retaining qualified employees necessary to successfully operate the company.

75.

Overture Services and Google AdWords, two marketing vendors, ceased to allow HELP to use their services until the company paid the charges that had improperly been charged to the minority shareholders' credit cards.

76.

Other important vendors and contractors of HELP ceased doing business with the company as a result of its failure to pay its obligations.

77.

In violation of O.C.G.A. § 14-2-701 and HELP's bylaws, Huffman canceled the company's annual shareholders' meeting for the calendar year 2005. No shareholders' meeting has been held in 2005.

78.

The board of directors has failed to meet on a regular basis.

79.

The board of directors has allowed HELP to operate without adequate monitoring or oversight of its business and financial affairs.

80.

As a result of the grossly negligent business practices and lack of oversight described in this Verified Complaint, the board of directors has caused substantial and excessive deterioration of HELP's financial condition. This has caused the creditors, employees, and shareholders of HELP to incur unnecessary financial loss.

## Misappropriation of Corporate Opportunities

81.

In or about August 2005, Huffman filed with the Georgia Secretary of State articles of incorporation for Dream Avenue Mortgage Corporation ("Dream Avenue"). *See* Exhibit 1.

82.

Since its inception, Dream Avenue has been operating out of HELP's corporate offices, using the equipment, supplies, employees, and other resources of HELP to operate a competing business.

83.

None of the Plaintiffs own any interest in Dream Avenue.

84.

According to a letter dated November 29, 2005 (the "November 29 Letter"), Huffman now intends to shut down HELP. *See* Exhibit 6 ("After running Home Equity Loan Products, Inc. for one year, I have decided that the company cannot continue.").

85.

Asserting he sees "no future in the company," Huffman plans to have Dream Avenue sublet HELP's corporate offices and equipment and operate a competing business in the offices currently leased by HELP, which will

completely supplant the business operations of HELP and effectively render

HELP an insolvent empty shell. *See* Exhibit 6.

86.

Huffman also intends to shirk HELP's obligations on its debts to

Wachovia Bank and other creditors by causing Dream Avenue to take over

HELP's business operations. *See* Exhibit 6 ("This third party company,

Dream Avenue Mortgage, will not be responsible to Wachovia or the

shareholders for those certain debts to Wachovia or for any Company

debts.").

87.

If Huffman is permitted to shut down HELP and transfer all of its

intellectual and tangible property to Dream Avenue, the substantial

investments made by the Plaintiffs in HELP and the value of their stock will

be rendered worthless.

**Failure to Comply with Shareholders' Demands**

88.

On July 26, 2005, counsel for the Plaintiffs sent a certified letter to

HELP's counsel of record demanding the production of certain corporate

records pursuant to O.C.G.A. § 14-2-1602 (the "First Document Demand

Letter"). A true and correct of copy of the First Document Demand Letter is attached to this Complaint as Exhibit 7.

89.

As of the date of this Complaint, HELP, under Huffman's direction, has failed to fully comply with the document requests contained in the First Document Demand Letter.

90.

On August 9, 2005, counsel for the Plaintiffs sent a certified letter to the directors of HELP pursuant to O.C.G.A. § 14-2-742 demanding that the directors take certain remedial actions to stem the company's declining financial performance, cure its failure to comply with various state statutes and regulations, and reverse other improper and/or illegal actions of the company (the "Shareholders' Demand Letter"). A true and correct copy of the Shareholders' Demand Letter is attached to this Complaint as Exhibit 8.

91.

As of the date of this Complaint, the directors have failed to comply with or otherwise respond to the demands contained in the Shareholders' Demand Letter.

92.

On November 28, 2005, counsel for the Plaintiffs sent a certified letter
to HELP's counsel of record identifying several deficiencies in HELP's
production of documents pursuant to the First Document Demand Letter and
requesting immediate correction of said deficiencies (the "Second Document
Demand Letter"). A true and correct of copy of the Second Document
Demand Letter is attached to this Complaint as Exhibit 9. Specifically,
HELP, under Huffman's direction, failed to produce any corporate minutes,
2005 financial records, or a shareholder list.

93.

As of the date of this Verified Complaint, the directors have failed to
comply with or otherwise respond to the Second Document Demand Letter.

94.

By failing to comply with the foregoing demands, the Officer and
Director Defendants have effectively frozen Plaintiffs, as the minority
shareholders, out of any involvement in the company, and have denied them
the information necessary to assess the financial condition of the company
and the cause(s) of the deterioration thereof.

## Plaintiffs Have Standing to Bring Their Claims
## Directly and Derivatively on Behalf of HELP

95.

Plaintiffs have standing to bring a direct action against the Officer and Director Defendants because the Officer and Director Defendants' acts and omissions have caused direct and special injuries to Plaintiffs.  The Officer and Director Defendants are jointly and severally liable for their own and each other's wrongful conduct.

96.

Pursuant to O.C.G.A. § 14-2-741, Plaintiffs have standing to bring this action derivatively on behalf of HELP because they were shareholders of HELP at the times of the acts and omissions described in this Verified Complaint, and they fairly and adequately represent the interests of HELP in enforcing the rights of the corporation.

97.

Pursuant to O.C.G.A. § 14-2-742, Plaintiffs have served a written demand on HELP's board of directors demanding that suitable corrective actions be taken, and more than ninety (90) days have elapsed, without any response, from the date this demand was made. *See* Shareholders' Demand Letter, Exhibit 7.

## COUNT I
## Breach of Fiduciary Duty
## Directly and Derivatively on Behalf of HELP
## Against the Officer and Director Defendants

98.

Plaintiffs hereby incorporate Paragraphs 1 through 97 of this Complaint as if fully restated herein.

99.

By virtue of the Officer and Director Defendants' positions within HELP, and because of their ability to control the business and corporate affairs of HELP, the Officer and Director Defendants were in a confidential fiduciary relationship with HELP and Plaintiffs and owed HELP and Plaintiffs the highest duties of due care, loyalty, honesty, good faith, and fair dealing.

100.

The Officer and Director Defendants had an obligation to discharge their duties to HELP and Plaintiffs with the diligence, care, and skill that an ordinarily prudent person would exercise in similar circumstances.

101.

The Officer and Director Defendants were required to use their abilities to control and manage HELP in a fair, just, and equitable manner, to act in furtherance of the best interests of HELP and Plaintiffs, to refrain from

abusing their positions of trust and control, and to not favor their own

interests or personal concerns or those of their fellow officers and/or

directors at the expense and to the detriment of HELP and Plaintiffs.

102.

The Officer and Director Defendants have breached their fiduciary

duties to Plaintiffs and HELP by, *inter alia:*

(a)    failing to hold timely, required, and necessary meetings of the

board of directors and shareholders;

(b)    defaulting on HELP's obligations to its creditors, vendors, and

employees;

(c)    defaulting on HELP's obligations under the Wachovia Note and

LOC;

(d)    failing to comply with applicable state mortgage laws and

regulations;

(e)    paying and accruing excessive salaries and benefits to certain

officers and employees of HELP including Huffman's family;

(f)    ousting Keith Armenia as President of HELP without replacing

him with an employee of suitable education and experience;

(g)    causing the financial deterioration of HELP;

(h)  exposing HELP's creditors, employees, and shareholders to financial damages;

(i)  failing to comply with shareholders' demands under state law;

(j)  denying the minority shareholders access to corporate and financial information;

(k)  freezing the minority shareholders out of HELP's business and financial affairs;

(l)  failing to properly monitor, oversee, and inquire into HELP's business and financial affairs;

(m)  allowing Huffman and Wharton to acquire shares of HELP without paying value for said shares;

(n)  diluting the value of HELP's shares;

(o)  holding improper and defective meetings of the board of directors and shareholders;

(p)  disrupting HELP's business operations by attempting to seize control of the company with an armed Sheriff's deputy;

(q)  making fraudulent charges on Plaintiffs' credit cards;

(r)  falsifying HELP's financial statements and tax documents;

(s)  discarding and destroying corporate records;

(t)    hiring non-competent family members to serve in important positions within HELP;

(u)    misappropriating corporate opportunities by operating a competing business;

(v)    failing to reasonably inform themselves about HELP's actual business and operations;

(w)    failing to create and implement a reasonable business plan for HELP;

(x)    assisting Huffman with his other business ventures and by causing or permitting HELP to provide office space, employees, intellectual and tangible property to Huffman's competing ventures; and

(y)    forcing HELP to sign management and employment agreements with Huffman and Wharton.

103.

The above-referenced conduct was not due to an honest error of judgment, but was due to the Officer and Director Defendants' reckless disregard of the rights and interests of HELP and Plaintiffs and their failure to act openly, fairly, and honestly, and without taking advantage of HELP and Plaintiffs.

104.

As a result of the foregoing breaches of their fiduciary duties owed to HELP and Plaintiffs, the Officer and Director Defendants willfully have participated in actively harming HELP and Plaintiffs and have caused HELP to waste its assets and suffer great losses.

105.

The Officer and Director Defendants have acted willfully, recklessly, and/or maliciously to cause Plaintiffs and HELP to sustain substantial harm. Defendants acted with the specific intent to cause harm, thereby entitling Plaintiffs and HELP to punitive damages. Plaintiffs also are entitled to recover their attorneys' fees for the successful prosecution of their direct and derivative claims.

## COUNT II
### Aiding and Abetting a Breach of Fiduciary Duty
### Directly and Derivatively on Behalf of HELP
### Against the Officer and Director Defendants

106.

Plaintiffs hereby incorporate Paragraphs 1 through 105 of this Verified Complaint as if fully restated herein.

107.

The Officer and Director Defendants breached their fiduciary duties to HELP and Plaintiffs as set forth in detail above.

108.

By failing to properly monitor, oversee, inquire into, and control the activities of HELP's officers, and of each other, by acting in concert with one another, and by permitting the improper conduct described above, the Officer and Director Defendants maliciously enabled the foregoing breaches of the fiduciary duties by one another.

109.

The Officer and Director Defendants have acted willfully, recklessly, and/or maliciously to cause Plaintiffs to sustain substantial harm. The Officer and Director Defendants acted with the specific intent to cause harm thereby entitling Plaintiffs to punitive damages. In addition, Plaintiffs are entitled to recover their attorneys' fees for the successful prosecution of their direct and derivative claims.

## COUNT III
### Gross Negligence
### Directly and Derivatively on Behalf of HELP
### Against The Officer and Director Defendants

110.

Plaintiffs hereby incorporate Paragraphs 1 through 109 of this Verified Complaint as if fully restated herein.

111.

The Officer and Director Defendants, as officers and directors of

HELP, owe Plaintiffs, as minority shareholders, and HELP the highest duties

of due care, loyalty, honesty, good faith, and fair dealing.

112.

The Officer and Director Defendants were grossly negligent by

engaging in, or allowing others to engage in, the wrongful conduct alleged

herein.

113.

The actions and omissions of the Officer and Director Defendants

were not due to an honest error of judgment, but were due to their gross

negligence and reckless disregard of the rights and interests of Plaintiffs and

HELP, which have suffered substantial harm therefrom.

## COUNT IV
### Securities Fraud
### Directly and Derivatively on Behalf of HELP
### Against Huffman and Wharton

114.

Plaintiffs hereby incorporate Paragraphs 1 through 113 of this

Verified Complaint as if fully restated herein.

115.

The efforts by Huffman and Wharton to acquire shares of HELP via the Stock Purchase Agreement, Exhibit 3, and the Note Purchase Agreement, Exhibit 4, constitute offers to purchase and/or actual purchases of securities under the Georgia Securities Act, O.C.G.A. §§ 10-5-1, *et seq.*

116.

Huffman and Wharton acquired their HELP stock from West and Hanks by fraudulent means promising to pay $96,000 when they had no intention of paying anything once the stock was transferred and they assumed control of the company. Huffman and Wharton also promised to pay for stock under the Note Purchase Agreement, but never in fact paid anything, although they did issue themselves additional shares of stock. This latter transaction was approved by, or acquiesced in, by the board of directors.

117.

In connection with their attempts to acquire HELP stock, Huffman and Wharton directly or indirectly employed a device, scheme, or artifice to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they are made, not misleading; and/or engaged in

an act, practice, or course of business that operated or would operate as a

fraud or deceit upon Plaintiffs and/or HELP. *See* O.C.G.A. § 10-5-12.

118.

The material misrepresentations and omissions described in this

Complaint, *supra,* were made by the Huffman and Wharton with scienter

and relied upon by Plaintiffs and/or HELP to their detriment.

119.

The Officer and Director Defendants are liable for securities fraud

because of their direct and indirect conduct and as control persons of HELP.

120.

The foregoing securities fraud proximately caused injury to Plaintiffs

and HELP.

121.

Plaintiffs and HELP have suffered damages from this securities fraud

in an amount to be proven at trial.

### COUNT V
### RICO Civil Claims
### Directly and Derivatively on Behalf of HELP
### Against the Officer and Director Defendants

122.

Plaintiffs hereby incorporate Paragraphs 1 through 121 of this

Verified Complaint as if fully restated herein.

123.

HELP is an enterprise as defined in O.C.G.A. § 16-14-3(6).

124.

Under Georgia law, it is unlawful for any person through a pattern of racketeering activity, or proceeds derived therefrom, to acquire or maintain, or to endeavor to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real or personal property including money. O.C.G.A. § 16-14-4.

125.

It is also unlawful under Georgia law for any person employed by or associated with any enterprise to conduct or participate in, or endeavor to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.  O.C.G.A. § 16-14-4.

126.

The Officer and Director Defendants, through a pattern of racketeering activity or proceeds derived therefrom, have acquired or maintained, or have endeavored to acquire or maintain, directly or indirectly, an interest in or control of HELP as well as the real or personal property of HELP and Plaintiffs, including money.

127.

The Officer and Director Defendants also were employed by, associated with, or exercised control over HELP, and have unlawfully conducted or participated in, or endeavored to conduct or participate in, directly or indirectly, HELP through a pattern of racketeering activity. *See* O.C.G.A. § 16-14-4.

128.

The Officer and Director Defendants have engaged in a pattern of racketeering activity as defined in O.C.G.A. § 16-14-3 by engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents and include the following racketeering activities as defined in O.C.G.A. § 16-14-3(9)(a):

    (a)    by making fraudulent charges on the credit cards of Milkwick and Dr. Joseph Armenia, Huffman and Wharton have violated the provisions of the Georgia Code with respect to illegal use of financial transaction cards, O.C.G.A. §§ 16-9-30, *et seq.;*

- 39 -

(b)    by fraudulently acquiring shares of HELP via the Stock Purchase Agreement, Exhibit 3, and the Note Purchase Agreement, Exhibit 4, without paying value, Huffman and Wharton have violated the Georgia Securities Act, O.C.G.A. §§ 10-5-1, *et seq.;*

(c)    the Officer and Director Defendants have engaged in theft by deception prohibited by O.C.G.A. § 16-8-3(a) by obtaining or endeavoring to obtain property by deceitful means or artful practice with the intention of depriving the owner of the property;

(d)    the Officer and Director Defendants have engaged in theft by deception prohibited by O.C.G.A. § 16-8-3(b) by preventing or endeavoring to prevent Plaintiffs from acquiring information pertinent to the disposition of HELP's property;

(e)    the Officer and Director Defendants have engaged in theft by deception prohibited by O.C.G.A. § 16-8-3 by promising or endeavoring to promise performance of services which they knew they did not intend to perform or knew that the services would not be performed;

(f)     the Officer and Director Defendants have engaged in theft and deposit account fraud by writing or authorizing checks intentionally exceeding the Wachovia LOC with no intention to repay Wachovia which constitutes theft pursuant to O.C.G.A. § 16-8-4 and deposit account fraud under O.C.G.A. § 16-9-20; and

(g)     by converting or allowing the conversion of the intellectual, intangible, and tangible property of HELP for the benefit of the competing enterprise Dream Avenue, the Officer and Director Defendants have engaged in, or aided and abetted others, in theft by conversion prohibited by O.C.G.A. § 16-8-4.

129.

Pursuant to O.C.G.A. § 16-14-6(a), Plaintiffs and HELP are entitled to an order of this Court:

(a)     requiring the Officer and Director Defendants to divest themselves of any interest in HELP and Dream Avenue and any personal property acquired through their pattern of racketeering activity;

(b)     prohibiting the Officer and Director Defendants from owning and operating another mortgage business including Dream

Avenue and taking any other action to further dissipate HELP

and harm HELP and Plaintiffs' ownership therein;

(c)     reorganizing HELP by appointing a receiver to oversee its

operations and recover HELP's assets from Dream Avenue; and

(d)     further suspending any licenses, permits, or approvals issued by

the State of Georgia to the Officer and Director Defendants for

the purposes of operating a mortgage business.

130.

Pursuant to O.C.G.A. § 16-14-6(b), Plaintiffs are entitled to a

temporary restraining order and preliminary injunction against the further

dissipation of HELP's assets and the injuring of HELP and the Plaintiffs'

ownership therein.

131.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs and HELP also are

entitled to recover treble damages, punitive damages, and attorneys' fees and

litigation costs from the Officer and Director Defendants for the damages

caused by their pattern of racketeering activity.

132.

Pursuant to O.C.G.A. § 16-14-6(d), Plaintiffs and HELP are entitled

to recover any property which the Officer and Director Defendants are

required to forfeit due to their pattern of racketeering activity.

## COUNT VI
### Misappropriation of Corporate Opportunities
### Directly and Derivatively on Behalf of HELP
### Against Huffman

133.

Plaintiffs hereby incorporate Paragraphs 1 through 132 of this

Verified Complaint as if fully restated herein.

134.

By operating a business that competed with HELP, Huffman has

misappropriated business opportunities that should have been directed to

HELP.

135.

Absent the Defendants' wrongdoing, HELP was or should have been

financially able to undertake the business opportunities that Huffman

misappropriated.

136.

Huffman has acted willfully, recklessly, and/or maliciously to cause

Plaintiffs and HELP to sustain substantial harm.  Huffman acted with the

specific intent to cause harm thereby entitling HELP and Plaintiffs to punitive damages.

### 137.

HELP also has sustained irreparable harm from which it may not have an adequate remedy at law.

### 138.

A constructive trust should be imposed on any opportunities and profits Huffman obtained as a result of his improper acts.

## COUNT VII
### Conspiracy to Misappropriate Corporate Opportunities Directly and Derivatively on Behalf of HELP Against Huffman and Dream Avenue

### 139.

Plaintiffs hereby incorporate Paragraphs 1 through 138 of this Verified Company as if fully restated herein.

### 140.

Huffman and Dream Avenue entered into a common design to usurp and misappropriate opportunities of HELP with the intent to injure HELP and Plaintiffs. Huffman and Dream Avenue conspired to form a separate company in the mortgage lending business that would cause HELP to lose all of its business and its intangible, intellectual, and tangible property.

141.

Huffman and Dream Avenue were aware of the opportunities that HELP had with existing and potential clients and referral sources. Huffman and Dream Avenue also were aware that HELP had an expectancy to continue in the mortgage lending business. These opportunities belong to HELP.

142.

Absent Defendants' wrongdoing, HELP was or should have been financially able to undertake the business opportunities that Huffman and Dream Avenue misappropriated.

143.

Dream Avenue and Huffman have acted willfully, recklessly, and/or maliciously to cause Plaintiffs and HELP to sustain substantial harm. Dream Avenue and Huffman have acted with the specific intent to cause harm thereby entitling HELP and Plaintiffs to punitive damages.

144.

HELP and Plaintiffs also have sustained irreparable harm for which they may not have an adequate remedy at law.

145.

A constructive trust should be imposed on any opportunities and profits that Huffman and Dream Avenue have obtained as a result of their improper acts.

146.

A preliminary and permanent injunction should be imposed on Huffman and Dream Avenue to prevent further misappropriation of HELP's business opportunities.

## COUNT VIII
### Conversion Directly and Derivatively on Behalf of HELP Against Huffman and Dream Avenue

147.

Plaintiffs hereby incorporate Paragraphs 1 through 146 of this Verified Company as if fully restated herein.

148.

Huffman and Dream Avenue have converted the intellectual, intangible, and tangible property of HELP.  Without these assets, HELP cannot survive.  Indeed, Huffman has informed Plaintiffs that he intends to shut down HELP.  *See* Exhibit 6.

149.

Huffman and Dream Avenue have acted willfully, recklessly, and/or maliciously to cause Plaintiffs and HELP to sustain substantial harm. Dream Avenue and Huffman acted with the specific intent to cause harm thereby entitling HELP and Plaintiffs to punitive damages.

150.

The conversion of HELP's assets by Huffman and Dream Avenue will cause HELP and Plaintiffs to suffer irreparable harm for which they may not have an adequate remedy at law.

151.

Plaintiffs and HELP are entitled to a preliminary and permanent injunction prohibiting Huffman and Dream Avenue from further converting any of HELP's assets and to require Huffman and Dream Avenue to return all of HELP's assets improperly converted.

152.

A constructive trust should be imposed on all of Dream Avenue's assets that were improperly obtained from HELP and all profits that Huffman and Dream Avenue have obtained from these assets.

## COUNT IX
### Tortious Interference with Business Relations
### Directly and Derivatively on Behalf of HELP
### Against Huffman and Dream Avenue

153.

Plaintiffs hereby incorporate Paragraphs 1 through 152 of this

Verified Company as if fully restated herein.

154.

Huffman and Dream Avenue were aware that HELP had a reasonable

expectancy of continuing to do business with those clients with whom it had

a business relationship as well as a reasonable expectancy to do future

mortgage lending business with its clients and referral sources.

155.

Dream Avenue and Huffman were aware of these clients by virtue of

Huffman's control of HELP.

156.

Huffman and Dream Avenue have now intentionally and tortiously

interfered with HELP's contractual relations with its clients and prospective

contractual relations with its clients and referral sources.

157.

As a result of Dream Avenue and Huffman's tortious interference

with HELP's contractual relationships and prospective contractual

relationships with its clients and referral sources, HELP and Plaintiffs have

sustained substantial damage.  Dream Avenue and Huffman have acted

willfully, recklessly, and maliciously, and with the specific intent to cause

harm, thereby entitling HELP and Plaintiffs to punitive damages.

### COUNT X
### Fraud, Misrepresentation, and Conspiracy to Defraud
### Directly and Derivatively on Behalf of HELP
### Against the Officer and Director Defendants

158.

Plaintiffs hereby incorporate Paragraphs 1 through 157 of this

Verified Complaint as if fully restated herein.

159.

The Officer and Director Defendants committed fraud,

misrepresentation, and engaged in a conspiracy to defraud by engaging in

the wrongful conduct set forth in this Complaint, *supra*.  This includes, but

is not limited to, making and authorizing others to make fraudulent and

unauthorized charges on the credit cards of Milkwick and Dr. Joseph

Armenia, acquiring stock and causing HELP to incur additional debt through

the Note Purchase Agreement without paying value, and reporting false and

fraudulent information on HELP's financial statements and corporate tax

documents.

160.

The material misrepresentations of the Officer and Director Defendants, and their silence in failing to inform HELP and Plaintiffs of material information relating to HELP and Plaintiffs' personal credit cards, were intended by the Officer and Director Defendants to induce, and did in fact induce, HELP and Plaintiffs to rely on the material omissions and misrepresentations.

161.

The Officer and Director Defendants knew that their false communications and material omissions would induce reliance by HELP and Plaintiffs.

162.

Plaintiffs and HELP reasonably relied on the intentional misrepresentations and material omissions of the Officer and Director Defendants.

163.

The reliance by HELP and Plaintiffs on the wrongful acts and omissions of the Officer and Director Defendants proximately caused them injury.

164.

The Officer and Director Defendants reached an understanding that they would act in concert to perpetrate a fraud upon HELP and Plaintiffs.

165.

The Officer and Director Defendants have acted willfully, recklessly, and/or maliciously to cause HELP and Plaintiffs to sustain substantial harm. The Officer and Director Defendants acted with the specific intent to cause harm thereby entitling HELP and Plaintiffs to punitive damages.

## COUNT XI
### Fraudulent Transfer Liability Directly by Dr. Joseph Armenia and Milkwick, and Derivatively on Behalf of HELP Against Dream Avenue and Huffman

166.

Plaintiffs hereby incorporate Paragraphs 1 through 165 of this Verified Complaint as if fully restated herein.

167.

Under the direction of Huffman, HELP made transfers of intangible, intellectual, and tangible property and/or incurred obligations to Huffman and Dream Avenue with the actual intent to hinder, delay, and/or defraud HELP and its creditors, including Dr. Joseph Armenia and Milkwick.

(d)     the value of the consideration received by HELP was far short of the reasonably equivalent value of the assets transferred or the amount of the obligation incurred; and

(e)     HELP was insolvent or became insolvent as a result of the transfers and/or obligations.

171.

Dr. Joseph Armenia and Milkwick are creditors of HELP whose claims arose prior to the time of said transfers and/or obligations.

172.

Pursuant to O.C.G.A. § 18-2-74(a)(1), Dream Avenue and Huffman are liable to HELP, Dr. Joseph Armenia, and Milkwick for fraudulent transfers and/or obligations from HELP.

173

Pursuant to O.C.G.A. § 18-2-74(a)(2), Dream Avenue and Huffman are liable to HELP, Dr. Joseph Armenia, and Milkwick for fraudulent transfers and/or obligations from HELP.

174.

Pursuant to O.C.G.A. § 18-2-75(a), Dream Avenue and Huffman are liable to HELP, Dr. Joseph Armenia, and Milkwick for fraudulent transfers and/or obligations from HELP.

175.

Pursuant to O.C.G.A. § 18-2-75(b), Huffman and Dream Avenue are liable to HELP, Dr. Joseph Armenia, and Milkwick for fraudulent transfers and/or obligations from HELP.

176.

HELP, Dr. Joseph Armenia, and Milkwick are entitled to the applicable fraudulent transfer remedies provided in O.C.G.A. § 18-2-77 against Dream Avenue and Huffman, including the appointment of a receiver, enjoining further dissipation of HELP's assets, and recovery of assets fraudulently conveyed.

### COUNT XII
### Piercing the Corporate Veil/Alter Ego Liability
### Derivatively on Behalf of HELP Against Dream Avenue

177.

Plaintiffs hereby incorporate Paragraphs 1 through 176 of this Complaint as if fully restated herein.

178.

Huffman and Dream Avenue failed to maintain corporate formalities and disregarded the separateness of Dream Avenue from HELP.

- 54 -

179.

Huffman and Dream Avenue commingled assets and operated HELP

and Dream Avenue as one corporation.

180.

Dream Avenue is so organized and controlled, and its business

conducted in such a manner, as to make it a mere agency, instrumentality,

and alter ego of HELP.

181.

Dream Avenue is liable for all the debts and obligations of HELP, and

all of the assets of Dream Avenue should be transferred to HELP.

## COUNT XIII
### Declaratory Judgment
### Directly and Derivatively

182.

Plaintiffs hereby incorporate Paragraphs 1 through 181 of this

Verified Complaint as if fully restated herein.

183.

The Stock Purchase Agreement, Exhibit 3, and Note Purchase

Agreement, Exhibit 4, are fraudulent, based upon inadequate consideration,

and unenforceable under Georgia law.

- 55 -

184.

Plaintiffs seek a declaration from this Court that the Stock Purchase Agreement, Note Purchase Agreement, and HELP shares allegedly acquired pursuant to these documents are void and unenforceable.

185.

Furthermore, based upon Dream Avenue's status a mere alter ego of HELP, the misappropriation of HELP's corporate opportunities and the conspiracy to misappropriate by Huffman and Dream Avenue, and the fraudulent transfers from HELP to Dream Avenue, the conversion of HELP's assets by Dream Avenue, Plaintiffs seek a declaration from this Court that all assets of Dream Avenue are assets of HELP and therefore must be transferred to HELP.

**COUNT XIV**
**Constructive Trust**
**Directly And Derivatively**

186.

Plaintiffs hereby incorporate Paragraphs 1 through 185 of this Complaint as if fully restated herein.

191.

Defendants improperly have misappropriated and fraudulently have conveyed intellectual, intangible, and tangible assets of HELP to themselves and Dream Avenue.

192.

Plaintiffs are entitled to an accounting to ascertain the amount of assets and profits of HELP that Defendants improperly misappropriated and/or fraudulently conveyed.

## COUNT XVI
### Aiding and Abetting a Breach of Contract by Milkwick
### Against the Officer and Director Defendants

193.

Plaintiffs hereby incorporate Paragraphs 1 through 192 of this Verified Complaint as if fully restated herein.

194.

Huffman deliberately and intentionally caused the Wachovia LOC to be overdrawn when he wrote two checks that exceeded the available credit. Huffman knew at the time he had no intention of causing HELP to repay the Wachovia Note or LOC.

195.

As a result of Huffman's refusal to allow HELP to pay HELP's outstanding obligations to Wachovia, HELP has breached the Wachovia Note and LOC.

196.

Milkwick signed a personal guaranty securing the Wachovia Note and LOC, but no longer has any influence over the business or financial affairs of HELP. Wachovia is seeking to hold Milkwick liable on said guaranty.

197.

The Officer and Director Defendants maliciously procured HELP's breaches of the Wachovia Note and LOC and are liable to Milkwick.

198.

The Officer and Director Defendants have acted willfully, recklessly, and/or maliciously to cause Milkwick to sustain substantial harm. The Officer and Director Defendants acted with the specific intent to cause harm, thereby entitling Milkwick to punitive damages.

## COUNT XVII
### Attorneys' Fees

199.

Plaintiffs hereby incorporate Paragraphs 1 through 198 of this Verified Complaint as if fully restated herein.

- 59 -

200.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

201.

Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their expenses of litigation, including, but not limited to, attorneys' fees.

202.

Pursuant to O.C.G.A. § 14-2-746, Plaintiffs are entitled to recover their expenses of litigation, including, but not limited to, attorneys' fees, for bringing claims derivatively on behalf of HELP.

203.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover their expenses of litigation, including, but not limited to, attorneys' fees.

WHEREFORE, Plaintiffs pray that this Court:

(a)    preliminarily and permanently enjoin Defendants from misappropriating, fraudulently conveying, and dissipating HELP's assets and business opportunities;

(b)    appoint a receiver to take over the operations of HELP and Dream Avenue;

- 60 -

(c)     enjoin Defendants from engaging in the mortgage lending business;

(d)     impose a constructive trust on all of Dream Avenue assets;

(e)     award Plaintiffs compensatory and punitive damages against all Defendants and hold Defendants jointly and severally liable;

(f)     award Plaintiffs a declaratory judgment holding that the Stock Purchase Agreement, Note Purchase Agreement, and HELP shares allegedly acquired pursuant to said documents are void and unenforceable;

(g)     award Plaintiffs a declaratory judgment holding that all property of Dream Avenue is in fact property of HELP and must be transferred to HELP;

(h)     order an accounting of all of Defendants assets to determine improper conveyance or transfer of HELP's assets;

(i)     award Plaintiffs their reasonable attorneys' fees and expenses of litigation against Defendants; and

(j)     award Plaintiffs such other and additional relief as this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

Respectfully submitted, this 19th day of December, 2005.

Jeffrey D. Horst
Georgia Bar No. 367834
Michael J. Jacobs
Georgia Bar No. 388288
Krevolin & Horst, LLC
100 Colony Square, Suite 2150
1175 Peachtree Street, N.E.
Atlanta, Georgia 30361
(404) 888-9700
(404) 888-9577 (facsimile)

*Attorneys for Plaintiffs*

## **VERIFICATION**

I hereby certify that the facts contained in the within and foregoing

Verified Complaint are true and correct to the best of my knowledge,

information, and belief.

Gary E. Milkwick

Sworn to and subscribed before me
this _19TH_ day of December, 2005.

Notary Public